Laws of Massachusetts, providing that no person shall presume to be a retailer or seller of wine, brandy; rum, or other spirituous liquors, in a less quantity than twenty-eight gallons, and that delivered and carried away all at one time, unless he is first licensed as a retailer of wine and spirits, arid that nothing in the law should be so construed as to require the county commissioners to grant any licenses, when in their opinion the public good does not require them to be granted,—
 

 All adjudged to be not inconsistent with any of the provisions of the constitution ' of the United States or acts of Congress under it.
 

 These cases^ were all brought up from the respective State courts by writs of error issued under the twenty-fifth'section of the Judiciary Act, and ’were commonly-known by the name of the License Cases.
 

 Involving the same question, they were argued together, but by different counsel. When the decision of the court was pronounced, it was not 'accompanied by any opinion of the court, as such. But six of the justices gave separate opinions, each for himself: Four of them treated the cases collectively in one opinion, whilst the remaining two expressed opinions in the cases separately. Hence it becomes necessary for the reporter to make a statement in each case, and to postpone the opinions until the completion of all the statements. The arguments of Counsel in each case will of course follow immediately after the statement in that case. They are placed in the order in which they are put by the Chief Justice in his opinion, but where the justices have given separate, opinions in each case, the order is observed which they themselves have chosen.
 

 
 *505
 
 Mr. Chief Justice Taney, one opinion,- three cases, Ü» <1
 
 00
 
 ►Cl
 

 Mr. Justice McLean, three opinions.
 

 Mr, Justice Catron, two opinions.
 

 (p.-bll.) Mr. Justice Daniel, one opinion, three cases,
 

 To begin with the case of
 

 It becomes necessary to insert the .forty-seventh chapter of the Revised Statutes, and also all act passed' in 1837. They are as follows : —
 

 Revised Statutes of
 
 Massachusetts,
 
 Chap.
 
 47. —
 
 The Regulation of Licensed Houses.
 

 “ Sect. 2. If any person shall sell any wine or spirituous liquor,
 
 *506
 
 or toy mixed liquor, part of which is spirituous, to be used in or about his house or other buildings, without being duly licensed as an innholder or common victualler, he shall forfeit for each offence twenty-dollars.
 

 “ Sect. 3-. No person shall presume to be á retailer or seller of wine, brandy, rum, or other spirituous liquors, in a less quantity than twenty-eight gallons, and that delivered and carried away all at one time, unless he is [at] first licensed as a retailer of wine and spirits, as is provided in this chapter, on pain of forfeiting twenty dollars for each offence.
 

 “ Sect. 4. If any person, licensed to be a retailer as aforesaid, shall sell any of the above liquors', either mixed or unmixed, to be used in or about his house'or shop, he shall forfeit for each offence twenty dollars.
 

 “ Sect.-5. Every innholder shall at all times be furnished with suitable provisions and lodging for strangers and travellers, and with stable-room, hay, and provender for their fiorses and cattle ; and if he shall nofbe at all times so provided, the county commissioners may revoke his license.
 

 “ Sect. 6. Every common victualler shall have all the rights and privileges, and be subjéct to all the duties and obligations, of inn-holders, excepting • that he shall not be required to furnish lodgings for travellers, nor ’stable-room, hay, and provender for horses and cattle. -
 

 “ Sect. 7. Every, innholder and common victualler shall at all times have a board or sign affixed to' his house, shop, cellar, or store, or in some conspicuous place near the same, with his name at large thereon, and the employment for which he is licensed, on pain of forfeiting twenty dollars.
 

 ‘‘ Sect. 8. If any'innholder shall, when requested, refuse to receive. and make suitable provisions for strangers and travellers, and their horses and' cattle, he shall, upon conviction thereof before the Court of Common Pleas, be punished by a fine not exceeding fifty dollars, and shall also, by order of the said court, be deprived of his license ; and the court shall order the sheriff or his deputy forthwith to cause his sign to be taken down.
 

 “ Sect.. 9. No innholder or common victualler shall have or keep in or about his house, or other buildings, yards, and gardens, or dependencies, any dice, cards, rbowls, billiards, quoits, or other implements used in gaming, nor shall suffer any person resorting thither to use or exercise any of said games, or any. other unlawful game or sport within his said premises, on pain of forfeiting ten dollars for every such offence,.
 

 “ Sect. 10. Every person convicted of using or exercising any of the games aforesaid, in or about any such house or building of an' innholder or common victualler, shall forfeit ten dollars.
 

 “ Sect. 11. No innholder or common victualler shall suffer any
 
 *507
 
 person to drink to drunkenness or excess in bis premises, nor suffer any minor or servant, travellers excepted, to have any strong drink there, on pain of forfeiting five dollars for each offence.
 

 “ Sect. 12. If any innholder or common victualler shall trust or give credit to any person for liquor, he shall lose and forfeit all the sums so trusted or credited, and all actions brought for such debt shall be utterly barred ; and the defendant in such action may plead the matter specially, or may givé it in evidence under the general, issue.
 

 “ Sect. 13. If any common victualler shall keep open his house, cellar, shop, store, or place of business on any part of .the Lord’s day or evening, or at a later hour than ten of the o’clock in the.evening of any other day of the week, and entertain any person therein by selling" him any spirituous or strong liquor,'he shall forfeit for each offence ten dollars.
 

 . ' l(
 
 Sect. 14, When any person shall, by excessive drinking of spirituous liquors., so misspend, waste, or lessen his-estate as thereby either to expose himself or his family to want or indigent circumstances, or the town to which he belongs to expense for the maintenance of him or his family, or .shall so habitually indulge himself in the use of .spirituous liquors as thereby greatly to injure his health or endanger the loss thereof, the selectmen of the town in which such spendthrift lives shall, in writing under their hands, forbid all licensed innholders, common victuallers, and retailers of the same •town, to sell to him ány spirituous or strong liquors aforesaid for the space of one year ; and they may in like manner forbid the selling of any such liquors to the said spendthrift by the said licensed persons of any other town to which the spendthrift may resort for the same ; and the city clerk of the city of Boston shall, under the direction of the mayor and aldermen thereof, issue a like prohibition as to any such spendthrift in the. said city.
 

 “ Sect. 15. The said mayor and aldermen, and said selectmen, shall, in the same manner, from year to year,' renew such prohibition as to all such persons as have not, in their opinion; reformed within the year; and if any innholder, common victualler, or retailer shall, during any such prohibition, sell to any such prohibited person any such spirituous liquor, he shall forfeit for each offence twenty dollars.
 

 “ Sect.- 16. When the said mayor and aldermen, or selectmen, in execution of the, foregoing provisions, shall have prohibited the sale of spirituous liquors to any such spendthrift, if any person shall, with a knowledge .of said prohibition, give, sell, purchase, or procure for and in behalf of such prohibited person, or for his use, any such spirituous liquors, he shall forfeit for each offence twenty dollars.
 

 11
 
 Sect. 1,7. The commissioners in the several counties tñay.li-cense, for the towns in their respective counties, as many persons to
 
 *508
 
 be innholders or retailers therein as they shall think the public good may- require ; and the mayor and aldermen of the city of Boston may, in like manner, license innholders and retailers in
 
 the
 
 said city; and the Court of Common Pleas in the county of Suffolk may, in like manner, license innholders and retailers in the town of Chelsea ; and every license, either to an innholder or retailer, shall contain, a specification of the' street, lane, alley, or other place, and the number of the building, or some, other particular'description thereof, where such licensed- person shall exercise his employment; and the license shall not protect any such person from the penalties provided in this chapter for exercising his employment in any other place than that which is specified in -the license.
 

 “ Sect. 18. The mayor and aldermen of the city of Boston may license, for the said city, as many persons to be common victuallers as they shall think the public good may require ; and .every such license shall contain such a specification or description, as is mentioned in the preceding section, of the street or other place, and of . the building where the licensed person shall exercise his employment ; and the license shall not protect him from the penalties pro-" vidéd in this chapter for exercising it in any other place. '
 

 “ Sect. 1$; All licenses to any innholder, retailer, or Common victualler .shall expire on the first day.of April in- each year ; but day license may be granted or renewed at any time during the. preceding month of March^ to take effect from the said first day .of April, and after that day they may be granted for the. remainder of the -year, whenever the officers authorized to grant the same shall deem it expedient.
 

 “Sect. 21. Any license to an innholder, retailer, or common victualler may be so -framed as to authorize the licensed person to sell wine, beer, ale,-cider, or any other fermented liquors, and not ■to authorize him to. sell brandy, rum, or any other spirituous liquor ; and no excise or fee shall-be required for such a license.
 

 “Sect. 22. The'clerk of thé commissioners in the -several counties shall, seasonably, before the time for granting licenses in each- year, transmit to the ‘ selectmen of every town within the county a list of the persons in such town who were licensed as inn-holders .or retailers the preceding, year.
 

 
 *509
 

 “
 
 Sect. 23. No license shall be granted or renewed to. any person, unless he shall produce a certificate from the -selectmen of’the town for which he applies to be licensed,, in substance, as follows, to wit: —We, the subscribers, a majority of the selectmen of the town of , .do hereby certify that . has applied to us to be recommended as .(here expressing the employment, and a particular description of the place for which the license is applied for) in the said town, and that, after mature consideration had thereon, at a meeting held for that purpose, at which, we were each'of us present, we are of opinion that the petition- of said be granted, he being, to the best of our knowledge, and behalf, a person of good moral .character.
 

 “ Sect. 24. Any person, producing such certificate of the selectmen, shall be. heard, and his application decided upon, either On a motion made orally by himself or his counsel, or upon a petition, in writing, as he shall elect.
 

 “ Sect. 25. If the selectmen of any town shall unreasonably neglect or refuse to make and deliver such a certificate, either for the original granting or the renewal of a license, the person aggrieved, thereby may apply for a license- to the commissioners, first giving twenty-four hours’ notice to a majority of the said selectmen of his. intended application, so that they may appear, if they s.eé fit, to'object thereto ; and if on-sueh,application it shall appear that the, said selectmen did unreasonably neglect or refuse to give the said certificate, and that:the public good requires that the. license should be granted, the commissioners may grant the same.
 

 “ Sect. 26. All the fines imposed by- this chapter may be recovered by indictment, to the use of the cpuiity where the offence is committed ; and when the. fine does not exceed twenty dollars, the offence may be prosecuted before a justice of . the peace, , subject to the right of appeal to the Court of Common Pleas, as in other cases.
 

 “ Sect 27. When any1 person shall be convicted under the provisions of this chapter, and' shall fail to pay the finé awarded against him, he may be imprisoned in the common jail for a time not ex-. ceeding ninety days, at the discretion of the court or justice before whom the trial may be had.
 

 “ Sect. 28. All prosecutions, under the provisions of this chapter, for offences committed in the city of Boston (excepting where the fine exceeds twenty dollars), maybe heard and-determined in the Police Court, subject to the right of appeal to the Municipal
 
 C.ourt;
 
 but the said Police Court shall, not have power, in any such case, ■ to sentence any person to imprisonment, except as provided in the preceding section.
 

 “ Sect. 29. Any person, licensed under the provisions of this chapter, who shall have-been twice befare convicted of- a breach of any of the said provisions, shall thereupon, in addition to the penal
 
 *510
 
 ties before provided, be liable fo a further punishment, by imprison ment in the- common jail, for a time no t-exeeeding. ninety days, at the.discretion of the court before whom the trial may be had.”
 

 “ An Act concerning Licensed Houses, and the Sale of Intoxicating Liquors.
 

 “
 
 Be it enacted by the Senate and House of Representatives in General Court assembled, and by the authority qf the same, as follows : —
 

 “
 
 Sect. 1. No licensed innholder, or other person, shall sell any' intoxicating liquor on Sunday, on pain of forfeiting twenty dollars for each offence, to be recovered in the manner and for the use provided in the twenty-sixth section of the forty-seventh chapter of the Revised Statutes.
 

 “
 
 Sect. 2. Any license toan innholder, or-common victualler, may be so framed as to authorize the licensed person to keep an inn or victualling-house without authority to sell any intoxicating liquor, and. no excise or. fee shall bq required for such license : Provided, that nothing contained in this act, or in the forty-seventh chapter of the'Revised Statutes, shall h.e so construed as to require the county commissioners' to grant any licenses, when- in their opinion the public good does not require them to be granted.
 

 “
 
 Sect. 3. Any person who shall have been licensed according to the provisions of the forty-seventh chapter of die Revised Statutes, or of this áct, and who shall have been twice convicted of. a breach of this act or of that chapter, shall, .on such second conviction,- in addition to the penalties prescribed for such offence, be adjudgéd to have forfeited his license.
 

 “
 
 Sect. 4. Any. person who shall have been three times convicted of a breach of this act, or of the forty-seventh, chapter of fhe Revised Statutes, shall, upon such third conviction, in addition to the penalties in this act and said chapter provided, be liable to be imprisoned in the common jail, for a time not exceeding ninety days, at the discretion of the court before whom the trial may be had.
 

 “ Sect. 5. The secretary of this Commonwealth shall cause a condensed summary of all laws relating to innholders, retailers, and licensed houses to be printed for the use of this Commonwealth, and he shall supply the county commissioners for the several counties, and such other officers as by law, are authorized to gránt licenses, .with the same; and the said commissioners, or other officers, whenever they grant any license, shall furnish each person so licensed with one copy of said" license laws, to the end that such person may know to what duties, restrictions, and liabilities he is subjected by law.”
 

 
 *511
 
 A conviction having taken place, under the indictment upon,.these statutes, the defendant filed several exceptions, of which it is material to notice only the following : —
 

 “2. It appeared upon the trial that some of the. sales charged in. the indictment were of foreign liqüors, and his Honor directed the jury that the license law of this Commonwealth applied ¿s well to imported spirits as to domestic, and that this Commonwealth could constitutionally control the sale of foreign spirits by retail, and that said law is not inconsistent with constitution or revenue laws of the United States. To this ruling also the defendant excepts.”
 

 The.court below allowed, this exception, together with all. the others, upon which.the case was removed to the Supreme Judicial Court. But- that court overruled the exceptions, and ordered judgment to be entered upon the verdict.
 

 Mr. Hallett,
 
 the eoünsel for Thurlow, then applied for,--and ob* tained, a writ of error to bring the .case to the Supreme Court of the United States, upon the following allegation of error, viz.:— '
 

 .“ That the several acts .of the legislature of Massachusetts concerning licens'ed houses and the sale of intoxicating liquors, arid especially the acts which are hereto appended and set out ns pa^t of the record in the said cause, upon which said judgment was founded, and also the opinion and judgment óf said Supreme Judicial Court of'Massachusetts, in the application and construction of-said acts to the sales of imported foreign liquors and spirits by the said Tirar-lo w, are repugnant to, -and inconsistent with, the'provisions of the constitution, treaties, and laws of the United States, in so far as the ’said'acts, and the construction thereon by the said Supreme Judicial Court of Massachusetts, prohibit, restrain, control, or prevent the sale of imported wines and spirituous liquors, by retail or otherwise, in the said State of Massachusetts, and are therefore void.”' -
 

 Upon die writ of error thus issued, the case came up‘to this court.
 

 Mr.. Webster
 
 opened the case. The best mode of presenting his views of the poihts which arose will be, to .reprint'the brief.filed by himself and
 
 Mr-. Choate
 
 in the former argument.
 

 It was as follows.: —
 

 
 *512
 
 1st. That they prohibit .even the importer of foreign spirits from selling them in the bottle, keg, or cask in which he imports them, either for consumption at the place of sale, or for carrying away ; and ore therefore unconstitutional, within the case of Brown
 
 v.
 
 Maryland, 12 Wheat. 419.
 

 2d.. That they are void, as being repugnant to the legislation of' Congress, in their application to purchasers from importers, of whom the plaintiff is ohe ; and hereunder he submits the following analysis of his argument.
 

 1st. The statutes of Massachusetts are not auxiliary to, cooperative witht and 'merely regulative of, the legislation of Congress, which admits foreign spirits to importation under prescribed rates of duty,, but are..antagonistieal to and in contravention of it, since they seek to diminish and discourage the sales of imported spirits to a greater degree than the legislation of Congress seeks to do it, upon tiie ground that the policy of Congress in this behalf is an erroneous policy.
 

 To maintain this, the object and operation of the Massachusetts statutes, arid the policy and the principle of constitutional power upon which they proceed, are to be considered.
 

 Without a license, no one can sell, in a single instance, spirits to be used on the premises of the vendor, and no one'can.sell them for the purpose of being carried away, in a less quantity than twenty-eight gallons, which must be bought and removed all at one time.
 

 The result, therefore, is, that without a license no one can sell spirits to be used, or to be carried away for use, since no-one purchases for úse so large a quantity as twenty-eight gallons tó be carried away at one time.
 

 Without a license, therefore, no one can sell at all by retail; and the retail, trade in spirits, the saje of spirits for use, is suppressed.
 

 2d. No one is entitled to a license, or can exact it, whatever be his-character of fitness to trade. .
 

 No court or person is required to give a license.' A tribunal called county commissioners, chosen by. the people of the counties* may, if in its judgment the public good requires it, grant licenses ; but even in such-case is not required to grant them.
 

 For the last six' years none have been granted in the county of the plaintiff’s residence, containing more than one hundred thousand inhabitants.
 

 ■ This withholding of licenses is no fraud on the. Massachusetts statutes, but in perfect conformity with them.
 

 Tn conformity with the law, thén? all sales of spirits for use may bé totally prohibited in Massachusetts.
 

 These laws design, to do just what can be legally, and without' defrauding them, done under them.
 

 • They design, then, to restrain all sales of spirits for us.e ; and they do this' upon a- general principle of policy, to wit :■ that such sales, for such purpose, fey whomsoever made, are. a public .evil.
 

 
 *513
 
 The difference, therefore, between them and all laws of mere policy, of quarantine, health', harbours, storage of gunpowder, and the like, is, that those laws are! auxiliary to, in aid and furtherance of, cooperative with, the Congressional legislation, while these deny its policy, and thwart and restrain its operations.
 

 These statutes do not confine themselves to providing for suitable persons, places, and modes of selling foreign spirits, so aa to secure the largest amount of traffic in the most expedient and prudent manner
 
 y
 
 but they mean, substantially and effectually, to put. an end to the traffic.
 

 The plaintiff in error, therefore, will discuss thesd laws, as if they did, in terms, prohibit all persons who buy . of importers from reselling, since they do substantially so operate ; and they assert- a principle of power broad enough to go to that extent.
 

 The general question, therefore, is this. Is a State law, prohibiting purchasers of spirits from importers to resell, on the ground that, for moral, medical, economical, or other reasons, the public good will not be promoted by such sale, repugnant to the acts of Congress, and to treaties authorizing importations of such spirits ?
 

 These sales were in 1841 j and subsequent. The acts of Congress are, 1832, ch. 227, 4 Statutes at Large,- 583 ; 1833,. ch. 55, 4 ibid. 629 ; 4 ibid. 25 ; 3 ibid. 310.
 

 These-authorize importations in casks of fifteen gallons.
 

 2d. What is the extent of the effect of an act of Congress authorizing importations ?
 

 1. Regarded as a license to, or contract with, the importer, communicating a right to sell, according to the view in Brown
 
 v.
 
 Maryland, 447, whát is its extent ?
 

 • The plaintiff contends that it would be repugnant to, and in fraud of, the license, either to ordain that no one shall buy of the importer, .or. to ordain that no one, having bought, shall resell, because either prohibitión would totally defeat the license itself. The license is a license to. carry the article to market,- to trade in' it, to have access with it to the consuming capacity of the country.
 

 The grounds on which Congress legislate, in passing such an act-, 'and the just expectations and reasonings of the importer, "prove this.
 

 2. Regarded as Congressional legislation, an act authorizing importations of spirits is a legislative determination that the ,fofeign article may properly, and shall, enter into the consumption “bf the country,'and be sold in the interior market thereof; and the Massachusetts statutes are intended to contravene.that determination, upon a directly opposite view of policy.
 

 3. Congress has the constitutional power to determine, on general grounds of policy, -what foreign articles shall enter into the-con
 
 *514
 
 sumption of the country, and be sold in the domestic' market, and to what extent; and it exercises'this power by an act laying duties. - It determines that all which- can be introduced and sold under such a rate of duties shall be, and the power of the States is merely auxiliary, cooperative, and regulative, securing proper persons by-whom the traffic shall be conducted, but not discountenancing and discouraging the traffic itself. . That power these statutes’transcend. ■
 

 It may be proper, also, in this connection, to reprint the abstract of the argument of
 
 Mr. Hallett,
 
 upon the same side, to show the reasons given for the doctrine sustained by the counsel for - the plaintiff in error.
 
 Mr. Hallett'1 s
 
 abstract was as follows : —
 

 Are the laws of Massachusetts concerning'the sale of imported wines and spirits constitutional and valid ?
 

 We contend they are not, because, —
 

 . 1. No State can prohibit, by wholesale or retail, the sale of merchandise authorized by a valid Igw of Congress, or by treaties, to be imported -into its markets ; the retail sale being as indispensable to the object of importation, viz. use ’ and consumption, as the wholesale.
 

 2.
 
 The laws' of the United States nowhere recognize any distinction between the wholesale and retail of imported merchandise, as connected with, the right of the importer to introduce such merchandise, for use and consumption, into the markets of the United States.
 

 3. Every concurrent or other power in a State is subject in its exercise to this limitation, that in tire event of .collision, the law of the, State must yield to the law of Congress, constitutionally passed. New York®. Miln, 11 Peters, 102; Commonwealth®. Kimball,
 
 24
 
 Pick. 359. .
 

 • 4. If Congress has the power to'regulate a subject-matter, a State cannot interfere to oppose or impede such regulation. The general government, ’ though limited, is supreme as to those objects over which it has power.' ■ Martin ®. Hunter, l Wheat. 304.; Cohens
 
 v.
 
 Virginia, 6-Wheat. 384 ; Prigg ®. Pennsylvania, 16 Peters, 539.
 

 5. The .commerce which Congress may regulate is something more than traffic. It is every species of commercial intercourse between the United States and foreign nations, and among the several States; u These words [regulate commerce] comprehend' every species of commercial intercourse between the. United States and foreign nations. No sort of trade can be carried on between this country and another to which this power does not extend.” Gibbons ®. Ogden, 9 Wheat. 189, 193, 194.
 

 6. The exercise of the power of a- State to regulate its internal commerce must not conflict with, and cannot control, the power of Congress to regulate foreign commerce, and commerce among the States. • The internal commerce on which a State can act, inde
 
 *515
 
 pendent of a law of Congress affecting the same, must be trade, or dealing in articles not connected with the operation of a valid law of the. United States. It must be “ completely internal,” local, and not connected with the United States government, in the exercise of its power to regulate commerce, and to lay and collect duties and imposts.
 

 7. “ The power [of the United States] to regulate commérce, must, not terminate at the boundaries of the State, but must enter its interior. The power is coextensive with the subject on which it acts.” Brown
 
 v.
 
 Maryland, 12 Wheat. 446.
 

 8. If a State, under the power of regulating her internal commerce, can exclusively regulate 'or control (to the extent of prohibition) commerce in imported merchandise, up to her boundaries, or the instant it shall pass, in bulk, from the.hands of the importer, she can thereby exclude foreign commerce, and deny her markets to foreign nations.
 

 - 9.' If a1 State has no such power of prohibition, she cannot empower her officers Or agents to do what she cannot do herself, viz., prohibit internal commerce in foreign merchandise. Suppose the legislature of Massachusetts, instead of conferring this .power of prohibition upon county commissioners, to be exercised in their uncontrolled discretion, should retain it, to be exercised by herself; it would be unlawful legislation, and collision of a State law with a law of the United States.-
 

 11. If it be said that it depends upon the administration of this law, whether it be constitutional or not, and therefore a law may be constitutional though its operation may be, unconstitutional, the answer is, that a State cannot so frame'a law as that under one sort of administration it is constitutional, and under, another unconstitutional, and both operations be lawful, and thus the law be valid.
 

 12. If a law of a State provides for arid contemplates collision with a law of the United States, the former is invalid, and must yield whenever the collision arises.
 

 14. The laws of Congress make no distinetion between commerce in imported wines and spirits and other foreign merchandise. A recognition of the power of a State, to exclude the first from its markets, whenever public sentiment requires it, must embrace th.e like power in respect to all other descriptions of imports, whenever the public sentiment in a State demands its exercise.
 

 15. There is no preeminence given to that class of State-legislation denominated police laws over other laws, whenever they cojpe in collision with the lawful exercise of a power of Congress ; and in. such case the latter, by the terms of the constitution, shall be the supretne law of the land.
 

 16. The law of Massachussetts in question is not a health law against contagion or mfectipn in the article imported; it aims to keep it out of the hands of the consumer, on • the ground of its abusé in excess of use. Health laws may exclude all such portions or cargoes of an article of commerce as are infectious ; but they .cannot exclude ¿ whole class of imported merchandise, on the ground that infected' portions or cargoes of it have been, or may be, imported. .
 

 17. Infected' articles of commerce may rightfully be excluded from passing the boundary of a State, and reaching the hands of the importer, as well as the consumer. But a -State cannot (under Brown v, Maryland, 12 Wheat.) exclude imported wines and spirits, or any sound article- of. commerce, frqm reaching the importer :. and this is an obvious distinction hetween health laws and a law of prohibition to cut off the transfer óf a sound article from the importer to the consumer.
 

 ■ 18. The point where regulation ceases and prohibition begins is the point of collision, and. of unconstitutional operation, of,.a State law affecting foreign commerce. In this respect a .State law becomes a law of prohibition when it punishes all who, sell without license, and confers the whole power* of licensing on agents, with express authority to withhold all licenses.
 

 19. In any and all cases, the power to-deny sale includes the power to prohibit importation and the question of power. is the-same,-whether exercised directly by the legislature, or indirectly by its agents thereto authorized.
 

 20. The operation of the law of Massachusetts on foreign.wines and spirits deprives imported articles of their vendible quality. This such law cannot rightfully do, for the whole course of legislation by Congress.shows that the right to.sell is connected with the payment of duties, and the right to.sell must extend beyon'd the'importer, or it is an inoperative right.
 

 21. The argument oh the other-side is, that if the power to
 
 *517
 
 regulate commerce can follow the imported article, with its vendible quality attached, into a State, it can compel consumption by the citizens of that State. This confounds the mere commercial right to offer for sale with the power to force purchase. All the 'law of' Congress requires in the markets of the United States is a right to sell and buy ; and when this right ceases, commerce ceases.
 

 .. 22. • The counsel on the other side further argues, that the State has a right' to deny this commerce, whenever her citizens ■ do not wish to deal in it. But if they do not desire to purchase, there would be nó need of a prohibition of sale. ' The law of prohibition proceeds on the-ground, that if commerce in this article were not denied, there woúld be such commerce ; and therefore it directly interferes with the law of-Congress regulating that commerce.
 

 23. A State may pass all such laws' as she pleases for the safety, health, or morals of her people, and may use whatever means she may think proper to^ that énd, subject only to this limitation, that .in the event of collision with a láw of Congress, the State must yield. Commonwealth
 
 v.
 
 Kimball, 24 Piclfr 363.
 

 .25. The general view as to the .prohibitory -provisions- of the, laws of Massachusetts .in this matter;, taken together, is, that it is a blending of two powers to be exercised at pleasure under the statute: .one -legitimate, — to regulate ; the other unconstitutional,— to prohibit, whenever the public sentiment in the State comes up to that point.
 

 26. Massachusetts assumes to abolish foreign commerce in her markets in imported spirit's, on the ground of thereby preserving the health and morals of the people ; hut at the samé .time, in her internal commerce and. exports, she encourages, without tax or excise, an annual manufacture, by her citizens of' 5,177,910 gallons of domestic spirits, which is one eighth part of the -whole product of ‘he United States in spirits distilled from molasses and grain.
 

 27.'Congress has not changed, its policy-in this respect, -but Massachusetts has changed hers, in opposition to the laws of- Congress. Until 1837$ the laws -of Massachusetts uniformly provided for the sale and consumption of wines and-ardent spirits imported into her markets. The act of 1786, ch.'-68.(1 -Mass.' Laws, 297), was in force with additiohal acts till 1832. By section ’fifteen,, the general sessions-were not to license more.-persons in any town than they shall judge necessary, for refreshment óf .travfeliers,
 
 *518
 
 or are necessary for' the public good, by which was meant the public convenience. Act of 1792, ch. 25, p. 417, required all persons to be licensed, on satisfactory evidence of fitness, and that such license will be subservient to the public good. Additional Acts, 1807, ch. 127 ; 1816; ch. 112; 1818, ch. 65.
 

 ‘ The act of 1832, ch. 166', reduced the maximumtoten gallons; and provided for a new class, victuallers. The commissioners to license, as innholders and retailers, as many applicants as they shah decide: the. public good may require. The ¡law now in force (Rev. Stat., ch. 47, 1835) altered this provision, to power tb county commissioners to license as many persons as they shall think the puhlic good'may require.
 

 Then followed the declaratory act of' 1837, ch. 242, that the cbmmissioners might withhold all licenses in their discretion.
 

 The act of 1838, ch. 157 (commonly called The Fifteen-gallon Ltfw), made penal all sales of spirituous liquors less than fifteen gallons ; licensed only apothecaries to sell for medicine and the arts, and punished . the sale by them, if to be drank ; and- -repealed all laws inconsistent with this act.
 

 If Massachusetts, by her laws, can exclude one-or more articles of import, she pays so much less revenue than other States that admit all. .This makes the. operation unequal so- far, arising from the legislation of Massachusetts adverse to the power of Gongtess to. collect revenue in all the Slates. Suppose the duty on foreign-wipes apd • spirits to be one fourteenth part of all' the revenue, the States can cut that off, if this legislation is valid ; an'd, by the same rule, all other sources to collect revenue are-wholly destroyed.
 

 29. So of the treaty-making-power. The . United States has power to reciprocate its. markets with the markets of foreign nations ; but if - a State -can shut its markets against any one or more of the articles admitted, by denying sale, the United States, cannot in gciod faith perform any such reciprocal engagement.
 

 1st. In the power to regulate foreign commerce.
 

 2d. In-the power to collect revenue on imports into the several States.
 

 3d. In the equal apportionment of taxes and duties in aH the States ; and,
 

 4th. In the power to make treaties.
 

 The following is a sketch of the argument, and shows the positions assumed and .maintained by him for the defendant, in error.
 

 The broad ground assumed by the plaintiff’s counsel is, that the statute of Massachusetts is unconstitutional, because it “prohibits, restrains, controls, or prevents the sale of imported wines find spirituous liquors, by retail or otherwise, in the State.”
 

 To make the policy of Massachusetts, in restraining an indiscriminate traffic, in intoxicating drinks, intelligible. we„must understand its history, and the staté and condition of things when the constitution of the United States was made.
 

 The court has often declared, that in a complicated system, which establishes two governments over the same people, it is necessary, in considering questions,of power, to look into contemporaneous facts ; that the objects designed to be secured by the federal' constitution may be understood, and, if possible, carried into effect. „
 

 The context of the instrument is not alone to be regarded, but the whole machinery of government; and care must be taken, in carrying out the fundamental principles, that the purpose of .the framers is not frustrated. 1
 

 As the power of Massachusetts to make laws restraining traffic in intoxicating drinks is denied, I shall, as a preliminary step, briefly state the history of her legislation upon this subject, and point out the consequences which will follow if this doctrine is maintained.
 

 The law of Massachusetts was revised in 1836 ; but acts similar in principle, and nearly so in detail, have existed for more than two centuries, and been enforced by her judicial tribunals. Ancient . Charters, 135, 314, 433 ; Laws of Mass., 1786, ch. 68 ; Revised Statutes, ch. 47, and several other statutes.
 

 From thence till this. time, the revenue system of the United
 
 *520
 
 States has been in force ; and the laws which are now supposed to conflict have during all that time worked harmoniously together.
 

 After a lapse of fifty-six years, it is now first discovered that the State is trenching upon the power of the United States, and impairing the revenue by restraining the sale of imported wines and spirits.
 

 Let it be remembered, however, that the United States do not and ha^e not complained of any wrong done by the State ; nor has any question ever been agitated in that quarter, in regard to the diminution of the revenue ; which makes it quite apparent that no serious inconvenience is felt.
 

 While, however, I admit the right of the plaintiff to appeal to this court, I must observe, that, although this long acquiescence may not prove the law of the State to be constitutional, it establishes the fact that it has produced no noticeable or sensible influence upon the revenue or the revenue power of the United States.' It would seem, also, to be a clear indication that the federal government is not hostile to the policy, of Massachusetts, or anxious to promote drinking to increase the revenue.
 

 It also proves, that the State has at all times during its organization as a body politic considered restraint in the traffic of spirits as essential to the public welfare.
 

 But the State is not an exception to other communities in this respect, but has followed out a principle which has been maintained and enforced through all ages among the civilized nations.
 

 Mr. Davis
 
 then proceeded to prove, from historical authority, that, the ancient Egyptians, the Greeks, the Romans, and the more Eastern nations did, through most periods of their existence, maintain rigid and severe restrictions upon the use of wine, and that excessive indulgence at all times was esteemed criminal.
 

 Ee referred also to China, and.the bordering nations, where abstinence from intoxicating drinks was enforced as a religious duty. He referred also to the Western nations of Europe, whose opinions and laws were equally condemnatory of excessive^ indulgence, and remarked that but one opinion prevailed through all ages.
 

 He said, that the common law of England and this country frowned upon intemperance, and held it to be without apology; for, while mental alienation by the providence of God was a juatir fication of crime, when it occurred by drink it was not; but the party was held answerable, because his insanity was occasioned by his own folly.
 

 Even in the new settlement of Oregon; made up of people congregated from different parts of the earth, the pale and manufacture of spirits was forbidden by law.
 

 But there was no occasion to multiply proofs of public opinion, for intemperance was everywhere deprecated and lamented, and had almost everywhere fallen under the condemnation of legal re-
 
 *521
 
 slraint, by enactments for that purpose, or by taxation. Experience had everywhere proved that there was a proneness in the human appetite to excess which requires control.
 

 It should be observed, that the ancients were unacquainted with alcohol, and used wine in its simplest and most unobjectionable forms ; while upon the moderns the double duty is devolved of contending against the demoralizing effects of both.
 

 The train of evils which mark the progress of intemperance is too. obvious to require comment. It brings with it degradation of character, impairs the moral and physical energies, wastes- the health, increases the number of paupers and criminals, undermines the morals, and sinks its victims to the lowest depths of vice and profligacy.
 

 In proof of this, there were in New York, in 1845, 26,114 paupers, 6,245 of whom were reduced to that condition by intemperance. In the same, year there were in Massachusetts 14,308, and 6,740 were addicted to excessive drinking.
 

 In the Singsing penitentiary, in 1845, there were 861 convicts, and 504 of these had been intemperate. The returns of other poor-houses and penitentiaries are equally startling.
 

 These facts prove that intemperance is an evil of all-pervading magnitude, and that all ages and communities have set upon it thé seal .of disapprobation.
 

 Her law stood upon her statute-book when the federal constitution was made, and there it still remains.
 

 No argument can make the fact clearer, that she has at all time's esteemed legal restraint as indispensable to the public welfare.
 

 Suppose, then, that the law of the State should be held unconstitutional, and she should be denied the power'to legislate upon the subject; what consequences would follow ?
 

 It will appear in the progress of this inquiry, that the United States have no power to regulate the traffic in wines and. spirits within the States ; and if the State has no ‘such power, tljen the right 'is abrogated.
 

 Is not such a result hostile to the intent of all parties to the constitution ? -The. framers did not intend it, and the- States could not have contemplated it.
 

 The United States are as much interested in the preservation of life, health, and morals as the States can be, and the motive to avert pauperism, crime, and profligacy must, with them, be equally persuasive. Tbe policy and duty of the federal and State governments must obviously be concurrent, and cannot be arrayed in .hostile attitude without violence to both.
 

 
 *522
 
 Neither the United States, nor the State of Massachusetts, could, therefore, when making the constitution, have anticipated the abrogation of this power ; and if it has been done, it is contrary to the intent of the parties. This is inferable, not only from what has been stated, but from the fact that these parties have moved on in their respective spheres for fifty-six years, in the exercise of their respective claims to power, without conflict and ■without entertaining a suspicion that the State has been enforcing laws without authority and in violation of right.
 

 It would be a-singular result, and. one to be deprecated, if, in giving construction to the constitution, the court should arrive at a conclusion injurious both to the United States and the States; a result which both would deplore as hostile to their best interests, .and subversive of the purposes which they had in' view when they ■entered into the constitutional • compact.
 

 Nothing but a commanding necessity can sanction such a step, and it never will be taken unless under an imperiously pressing sense of duty.
 

 With such facts and circumstances as these surrounding it,' we come to the consideration of the question, whether the law of Massachusetts's constitutional.
 

 The plaintiff in error assumes the affirmative, and must , establish the fact that it is incompatible with, or repugnant to, the constitution and laws of the United States.
 

 It will not be denied that the federal government has no powers except such as are granted- to it and are enumerated in the constitution.
 

 On the other hand, it is equally clear and indisputable, that the States retain in themselves all powers not so granted or prohibited by the constitution. This is an irresistible inference; but the States made it doubly certain, by declaring in an amendment the ■fact, in the most clear and explicit terms.
 

 While, therefore, the United States hold the powers which are granted, the States hold those which are not granted or prohibited, and. both are fully sanctioned and maintained by the constitution.
 

 The plaintiff, therefore, must maintain that Massachusetts has, in making her law, exercised a power not reserved tp her.
 

 The ground assumed is, that the United States authorize importations, and levy upon them a duty for revenue ; that the right to sell is incident to the right to import, and cannot be controlled or regulated by the State in such-a manner as to dimmish the sales or to impair the revenue.
 

 The constitution declares, that Congress has power
 
 “
 
 to regulate -commerce with foreign nations, and among the several States, and with the Indian tribes.”
 

 
 *523
 
 These words give all the authority which the United States have over commerce.
 

 The power is manifestly limited to commerce with foreign nations, commerce among the States, and commerce with the Indian tribes. The grant covers these three kinds of commerce, and nothing more.
 

 In this case, commerce with foreign nations alone is to be considered.. The domestic commerce is necessarily excluded ; for it is neither foreign, nor is it trade among the States, nor with the Indian tribes.
 

 This inference is not only apparent from the language of the constitution, but is fully sustained by authority.
 

 In Gibbons
 
 v.
 
 Ogden, 9 Wheat. 203, the court, in commenting on inspection laws, employ the following language: — “ They form a portion of that immense mass of legislation which embraces every thing within the territory of a State, not surrendered to the general government; all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, are component parts of this mass. .JNfo direct general' power over these objects is granted to Congress ; and consequently they remain subject to State legislation.”
 

 It is, therefore, judicially settled, that the power to regulate the internal commerce of a State is reserved to and resides in it.
 

 Such being the partition of powers between the States and the United States, I come to the inquiry, What is the .character of the law of Massachusetts.? Upon what basis'does it stand, .and from what powe^ or right in the State is it derived ? And I shall contend that it is a regulation of the internal commerce of .the State, having for its object the preservation of order, morals, and health, and intended to discourage intemperance and to promote sobriety. And such being its general characteristics, I shall also contend further, that it falls within that class of laws generally called' police regulations.
 

 The trade intended to be regulated is completely internal, and spread over the whole territory of the State. That the regulation of such a commerce belongs to the State is evident, not only from the authority cited, but from the language of the court at page 195 of the same case.
 
 “
 
 The completely internal commerce of a State,” says Chief Justice Marshall, “ then, may he considered as reserved for the State itself.” _ .
 

 _ The State has furthermore a right to provide for the health of its citizens by police regulations.. In Gibbons
 
 v.
 
 Ogden, 9 Wheat. 205,
 
 *524
 
 the court say of quarantine and health lpws, — “ They are considered as flowing from the acknowledged power of the State to provide for the health of its citizens”; again, at page 208, “the acknowledged power, of a State to regulate'its police, its domestic wade, and to govern its own citizens,” is spoken of as unquestioned.
 

 It may,, then, be assumed on authority which does not admit-of doubt, that a State has a right to regulate its internal commerce, and to provide for the health and government of its citizens by suitable laws. That such, regulations are considered by this court to be police laws will not be doubted.
 

 These propositions .are sustáined by high authority. The State possesses the undeniable right to regulate its internal trade, and to maintain municipal or police regulations to protect and promote the pifare of the people.
 

 That a law restraining an indiscriminate traffic in wines and spirits, and designed to protect life and health by promoting temperance and sobriety, is a police law canhot be questioned.
 

 The law of Massachusetts being, then, a measure relating to a trade completely internal, and a police regulation, is, in all its aspects, founded- on an acknowledged power which is vested ip the State by the provisions of the constitution.
 

 This being the highest source of authority, it would seem sufficiently to justify and maintain the law.
 

 But it is contended that even this foundation may fail a-State in cases of conflict; for the law of the United States is supreme, and must, in such cases, prevail against the admitted right of á State.
 

 Our system is obviously'complicated, because the federal and State governments extend over the same territory and people, and act upon the same persons and things. For example, foreign commerce is destined- to become internal, and internal to become foreign. This flux and reflux from jurisdiction to jurisdiction, brings the laws into contact, and the jurisdictions impinge upon each other.
 

 .This opens the question, Which in such cases shall prevail ? The answer has been, that federal power in such c.ases is para.mount and supreme. This is sometimes said to be an axiom to which .State authority must bow in- submission. But if we admit the authority, the question still remains, How far does this implied supremacy extend over the acknowledged powers of the States ? Is it unlimited, and must a State yield to its touch whenever felt ? No one, I believe, will urge the doctrine to this extremity.
 

 The decisions of this tribunal will establish the fact, that the supremacy of federal power in cases of conflict has boundaries and limits, and that the action of State laws derived from powers reserved to the States is never unconstitutional until it becomes, incompatible with, or repugnant to, the federal laws.
 

 But what is incompatibility ? What is repugnancy ? This in
 
 *525
 
 quiry often presents perplexing considerations, because no fixed, determinate rule can be laid down by which cases can. be tested ; but each case, as it comes up, is'left, to be decided by the facts which surround it. Whenever State power touches that of the United States, whoever may profit by it is anxious to make out a case of incompatibility or repugnancy, and thus every seeming conflict is liable to become a matter of judicial investigation ; and there is a constant disposition manifested to expand the power of the 'general government, and to contract that Of the States.
 

 We are not, however, without authority which throws no inconsiderable light on this inquiry. The learned commentator upon the constitution,.! Com. 432, after an examination of all the authorities, sums up the result: — “In cases of implied limitations or prohibitions of power [and this is one] it is not sufficient to show a possible or potentialjnconvenience. There must be a plain incompatibility, a direct repugnancy, or an extreme inconvenience, leading irresistibly to the same conclusion.”
 

 Under this rule a State'.may exercise its power in. any way or form, and to any extent, if its action upon federal power does not amount to manifest incompatibility or direct repugnancy. The fact of incompatibility or repugnancy must not be equivocal, but clear' and certain. In cases, of incompatibility, it must be apparent that the laws of the United States and a State supposed to be in conflict cannot stand together, or be reconciled or harmonized with each other. The whole doctrine of repugnancy and incompatibility is •confined within these narrow limits. It is applied, in fact, only to cases where the power of a . State so acts upon a power of the United States as substantially to subvert or defeat it. In such .cases only has the supiemacy of the federal law been maintsb od over constitutional- State power. The ■ rule clearly implies, in all cases of doubt, that the, power of the State is to prevail against this implied right of supremacy. Even potential inconvenience is not to be regarded, but must be tolerated as long as it falls short of' incompatibility or repugnancy.
 

 It requires but little consideration of the subject to justify these cautious limits of power
 
 ;
 
 for if the laws of the State must recede before those of the United States whenever'they come into contact, it is manifest that State power would be in imminent danger of being, obliterated ; for, as State power yields, federal power must follow and press upon it.. The dangers which' beset, the exercise of power by sovereignties whose limits of authority are not ascertainable cannot be more forcibly described than in the language, of the late chief justice, in McCulloch
 
 v.
 
 Maryland, 4 Wheat. 316, 430. After stating the grounds upon which the decision rested, the learned judge says : —“ We ate relieved, as we ought to be, from clashing sovereignty; from interfering powers ; from repugnancy between a right in one government to pull down what there is an
 
 *526
 
 acknowledged right in another to build up ; from the incompatibility of a right in one government to destroy what there is a right in another to preserve ; —we are not driven to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree the abuse, of power.” The court congratulatéd itself upon having discovered the limits of sovereignty without resorting to the implied right of supremacy on the part of the United States, which necessarily involved the most conflicting and dangerous considerations.
 

 This case is but one among the many proofs given by this court of a uniform and anxious desire to give full and free scope to the powers of the respective governments, and to harmonize, if possible, their action, without asserting the supreme authority of the federal constitution oyer the acknowledged powers of the States; This can never be done when it subverts the lawful power of the States without creating alarm, and impairing the stability of the Union.
 

 The cautious and almost reluctant minner in which this, court have applied this doctrine of supremacy over acknowledged State power is manifest.in many of its decisions, which prove incontestably its disposition to avoid such conflict if possible.
 

 It has already been shown,from Gibbons
 
 v.
 
 Ogden, “that inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State,” originate from powers which are reserved to the States. What is the character of those• laws, and'how are they executed? The answer will show how far the power of a State may be carried without incompatibility or repugnancy'.
 

 They deal with foreign commerce, asserting, as will appear by their provisions, absolute control over it for certain purposes which are connected with the public welfare and safety.
 

 The inspection laws authorize the detention and examination of merchandise, and the imposition of marks which denote its true character, and often affect its value. .
 

 Quarantine laws direct possession to be taken of vessels arriving, and require them, with their crews, passengers, and cargoes, to be detained, and forbid' intercourse with the shore
 

 The health laws carry with them a similar authority, and provide not only for detention, but for the purification, and, if necessary, the destruction of the cargó.
 

 In Brown
 
 v.
 
 Maryland,
 
 12
 
 Wheat. 443,. the court observe, “ that the power to direct the removal of gunpowder is á branch of the police power which unquestionably remains and ought to remain with the States.” They add, also, that “ the removal or destruction of infectious or unsound articles is undoubtedly a branch of the same power.”
 

 These laws interfere directly with foreign commerce, asserting a right to control men, vessels, and cargoes, before a voyage is completed..
 

 
 *527
 
 Harbour laws,'ballast laws, &c., are of a similar character, arid hence it has been supposed that they are regulations of foreign commerce.
 

 But this court repel this conclusion, and maintain their constitutionality, because they are police regulations of the States, and derived from a right reserved to make and execute such laws ; and are hot, therefore, regulations of foreign commerce, though,- for the purposes of protecting, life, health, and property, they necessarily deal with it. The court go farther, and also maintain, that such laws are not incompatible with or repugnant to the laws of the United States which relate to foreign commerce, and therefore np objection exists to the exercise of such power by the States over foreign commerce.
 

 It is manifest from ■ these authorities, that State power,., and especially police power, may be exercised upon matters within the jurisdiction and under the control of the United States without incompatibility or repugnance. The protection- of life, health, and property demand it. The right to do it is acknowledged, and cannot be questioned, unless its exercise defeats or subverts the power of the United States ; then, and in such Cases only, it is viewed as incompatible or repugnant.
 

 This brings the doctrine of.repugnancy and incompatibility, when asserted against the rightful power, of a State, into, narrow limits ; and it is believed that no case has yet-occurred before this court, in which the power of the United States, be.cause it is supreme, has been extended by implication so as to defeat or. overrule the acknowledged authority of a State, unless -concurrent powers, constitute an exception. ’
 

 ' It is further manifest, that the right of a State to make police laws is unquestioned, because, as the court- declare, it is ;among the., re-; served rights. This power, I have shown, has been- and is exercised in a great variety of ways, and in many forms, over foreign commerce. ■
 

 It. is obvious, therefore, that it constitutes the boundaries of sovereignty, and is paramount to the power of .the. United States in all cases, except where it defeats or subverts the granted powers of. the United States. o.
 

 It is further obvious, that the. ¿ourt will not consider a State law, made-in the exercise of lawful authority,:frnd in the. exercise pf a power belonging to . the State, a law regulating’foreign commerce, though it.may act upop-and influence such coipmerce..;
 

 It is also obvious, that the court has never denied* but, on the other hand, has always admitted, the right, of a. State to make police regulations, to protect life, health, and the property of the citizens, and the right to extend.this protection against the dangers incident to ¡foreign commerce has uniformly, beep distinctly recognized.
 

 It .can neither bq.admitted nor maintained that the United States,
 
 *528
 
 under a general power to regulate foreign commerce, has a right, without restraint, and in defiance of State powers, to import disease and pestilence, to fill the country with infamous persons, or to debauch the public morals. Such is not the design of the constitution ; and if such a right shall be successfully asserted, it will soon prove that the fetieral and State governments cannot exist together.
 

 Such are the restraints which oppose the extension of federal power, in cases of apparent conflict, on the ground that it is supreme.
 

 A careful .examination of the many decisions will prove that the court has anxiously studied to fix, as far as circumstances will permit, definite boundaries to sovereignty, leaving them to depend as little as possible upon questions of incompatibility or repugnancy.
 

 The police latjvs of the State have uniformly been maintained, on the ground that the States have a right to make them, and this right is not to be questioned, although in the exercise of it the laws and power of the United States are and must be affected, or the remedy- against alarming evils be incomplete. It seems to me that the court have practically, and for the best of reasons, placed such laws on the ground that they emanate from exclusive and independent powers enjoyed by the States.
 

 This position has been gradually approached, with a watchful solicitude at every step taken in advance.
 

 ■ In New York
 
 v.
 
 Miln, 11 Peters, 102, a reexamination of the. authorities was made, and the grounds of the opinion there delivered are stated with great clearness (p. 139). After discussing the principles so ably laid down in Gibbons
 
 v.
 
 Ogden, the learned judge says: — “We do not place our opinion upon this ground. We choose rather to plant, ourselves on what we consider impregnable positions. They are these, that: a State has the: same undeniable and unlimited jurisdiction over all persons and things within its territorial. limits as any foreign nation, where that jurisdiction is not surrendered or restrained by the constitution of the United States-; that, by virtue of this, it is not only the right but the bounden and solemn duty of a State to advance the happiness, tne saféty, and prosperity of its people, and to provide for its general welfare by any and every act of legislation which it may deem conducive to these ends, where the power over the particular subject, or the manner of its exercise, is not surrendered or restrained in the manner just stated ; that all those powers which relate.to merely municipal legislation, or what may perhaps be more properly called internal' police, are not thus surrendered or restrained ; and that consequently, in relation to these, the authority of a State is complete', unqualified, and exclusive.”
 

 This authority defines the great question of boundary between the sovereignties with an accurracy which cannot be mistaken, so far as regards police laws.
 

 The powers not conceded or prohibited by the constitution re
 
 *529
 
 main in the States unchanged, unaltered, and unimpaired, and as fully in force as if no constitution had been made.
 

 None of those powers which relate to municipal legislation or internal police have been surrendered or restrained, but are complete, unqualified, and exclusive.
 

 If they are complete, the State has. the whole and the sole enjoyment.
 

 If they are unqualified, they remain as they were, unaltered and unchanged.
 

 If they are exclusive, there can be no participation in them by another.
 

 The inference is'irresistible, that such powers are independent of and paramount to the constitution of the United States, and therefore not subject to any supreme power of the federal government in cases of conflict.
 

 This is but carrying out the provisions of the instrument, as they apparently stand.
 

 It. is manifest, that the laws of the two governments must meet . and mix, because the jurisdictions commingle, and the question is, Did not the framers of the constitution intend it should be so ?
 

 When they made that instrument, and gave to the United States the control over foreign commerce, and reserved to the States the police powers, they knew that life and health and property in the States must be provided for ; and they knew then, as well as we do now, that it could not be done without an interference with foreign commerce. • Did they hot intend, then, when they granted -this power to the United States, that it should be held and enjoyed subject to the exercise of these .reserved powers in the States ?
 

 . Such at least is the effect of this decision, if language has any meaning ; and this case does little more than carry out the principles. which had been previously maintained in practicé.
 

 The police laws had in fact everywhere been maintained against the supreme power of the United States, notwithstanding this obvious interference.
 

 The pressure of this principle of supremacy was forced upon the States .with such zeal, and the supposed cases of incompatibility be^ came so frequent, that the exigencies of the times demanded a positive rule to the extent that it could be safely established. .
 

 The step was taken eleven years ago, and what inconvenience has been experienced ? In what has the power of the United States been impaired or disturbed ? Who has sensibly felt any change ? Whose interests have not been well provided for, and safely protected ? Much has been said and sung by the theorists ; but the laws have been well harmonized, and the public have been well satisfied.
 

 In regard to constitutional principle, this case is decisive of the one under consideration, as it admits the authority of a State to
 
 *530
 
 maintain police regulations in regard to'its internal affairs, whatever may be their effect or influence upon the laws of the United States.
 

 All this is conceded when the power, of the State is declared to be complete, unqualified, and exclusive. Commonwealth
 
 v.
 
 Kim-ball, 24 Pick. 365 ; Pierce in error
 
 v.
 
 New Hampshire, Law Reporter, Sept. 1845.
 

 I have- thus far, in speaking of constitutional power, assumed that the law of Massachusetts is a police measure, made in good faith, to regulate the traffic in intoxicating drinks.
 

 This has, however, been questioned, oft the supposition that it is, in fact, a regulation of foreign commerce.
 

 It becomes necessary to look into its provisions, to ascertain whether they are adapted tp the professed object, or designed to cover up a specious fraud.
 

 The retailers ■ are tavern-keepers, and small grocers, living wherever there is travel and population.
 

 The design- of the law is manifestly to-prevent, tippling and disorder, by promoting temperance and sobriety ; and, whether it be a regulation of trade or pólice, or both, relates to affairs completely internal.
 

 Is this a suitable matter to engage legislative attention ? Does such a traffic demand restraint, or does the legislature employ it as a pretext to regulate foreign commerce ?
 

 I have already dwelt sufficiently on this point, and have proved that intemperance is everywhere deprecated and deplored, that-the world has raised its voice in remonstrance against an indiscriminate traffic in wines and spirits, and it seems to me that if health, morals, usefulness, and respectability are worthy of public consideration, and merit protection against an insidious foe, the legislature would be criminally guilty in wholly disregarding a matter of such obvious importance ; ■ and that the exercise of the power needs no justification.
 

 But are the provisions of the law suited to the professed object ? The evident end in view is to place the trade in safe and suitable hands, in the custody of those .who will use without abusing it, and mitigate, instead of aggravating, the evils incident to it.
 

 To carry this principle out, the law authorizes the county commissioners, who are elected by the people, and supposed to be an exponent of public opinion, to license as many innholders and retailers as the public good requires. Can any one desire more ?
 

 If suitable persons are to be selected, the mode is probably as unobjectionable as any which can be devised ; but if no selection is to. be made, as is contended, and all persons are to have a right to demand a license, a law, with such provisions, would cease to be a regulation, and had better.be abolished..
 

 
 *531
 
 Another feature of the law is, that it makes no discrimination between foreign and domestic wines and spirits, but .deals with all alike. . This would seem to furnish sufficient proof that jt has no special reference to the importing trade, but aims at a general regulation,, and is designed to promote temperance and not to regulate foreign commerce.
 

 When these facts are taken in connection with the antiquity of the policy, no reasonable doubt can exist as to the good faith and, sincerity of purpose in the legislature.
 

 But it is objected to the law, that the commissioners may so exercise their discretion as to impair or defeat the revenue.
 

 This argument supposes that judicial officers will-abuse their authority. But it is not a question as to the manner of using power, but of right.
 

 A discretion is reposed in all judicial tribunals, where facts are to be ascertained as the foundation of a judgment. In all such cases, the law may be perverted ; but the abuse is proof of misconduct in the officer, and not of the unconstitutionality of the law.
 

 . Whether an applicant for a license is a suitable person, and whether the public good requires the grant to be made, are facts to be ascertained, which must depend upon evidence ; and the questions cannot be decided without an exercise of judgment.
 

 It is difficult to comprehend how a selection of suitable persons, or of suitable places, can be made, without the,exercise of so much discretion as such a decision, implies. There is, in fabt, no intermediate ground between this and indiscriminate traffic.
 

 But it is further objected to this system, that its whole tendency is to reduce consumption, and to diminish the revenue.
 

 • The State has a right to regulate its internal trade, and to maintain police laws. No condition is annexed to this right, which requires the Sítate to exercise the power without impairing the revenue upon imports. The law may have some remote effect on the revenue ; but what law or principle of the constitution forbids it ? There can be no repugnancy or incompatibility till the powers of the United States to raise revenue is substantially defeated.
 

 Of such a state of things there is no proof. On the contrary, the license laws have been in operation for fifty-six years.with the revenue system, and no sensible or noticeable effect has been produced ; not enough even to make it a topic of discussion. •
 

 If the whole revenue from this source were dried up, it could have little tendency to defeat or control the financial power of the United States, which is too broad and ample in resources to be materially affected by any such legislation.
 

 But the argument proves too much, — it denies to a State the right to make a law which tends to impair the revenue of the United States.
 

 Thé right of taxation is concurrent, and may be and is exercised
 
 *532
 
 by both governments upon the same persons and property. This is an undeniable right in a State, and yet it is manifest that it cannot be exercised without impairing the resources of the United States.
 

 Slaves are taxable property, and cannot be .emancipated without diminishing the resources of revenue ; but will it be contended that a law of emancipation is unconstitutional for that cause ?
 

 So,.too, laws which establish market-days, and forbid sales upon the Sabbath, have a tendency to restrain indiscriminate traffic.
 

 ."Without, however, pursuing this reasoning, which might be easily extended, I deny that a diminution in the consumption of wines and spirits raises any presumption that the general revenue is impaired by the process. - On the contrary, my belief is, that, if the facts were to undergo the severest scrutiny, it would turn out quite otherwise. It has never been maintained that a free use of wines and spirits has any tendency to promote public .prosperity, nor is it denied that an excessive use is manifestly prejudicial. There can be no doubt, that where abstinence or severe temperance prevails accumulation is increased and the means of subsistence enlarged. ■These ordinarily go to support existence, and, creating a greater expenditure in the necessaries and comforts of life, contribute in other forms to the revenue, giving a gain instead of a loss.
 

 But it is urged that the commissioners may press their powers so far as to exclude consumption ; and if they should, the revenue would probably suffer in no respect, as the general prosperity would be improved.
 

 But, aside from this consideration, I apprehend there is no objection to such a step. Police laws may be carried to any extent which the public welfare demands. If the heálth, the morals, and the welfare of the public demand the exclusion of an evil, there is. a "right to shut it out, regardless of revenue and of private interests This power may and should be exercised just to the extent w'hich fh>. public exigency demands.
 

 Such is the long-established practice in regard to health. If the. cargo of a vessel is infected and dangerous,'it is destroyed ; and al! revenue and private interests are sacrificed for the public safety. Gunpowder is required to be landed and stored in a way which saves life and property from jeopardy. Ballast is required to be deposited where it does no mischief to navigation. The publication, by sale or otherwise, of obscene books, prints, pictures, &c., is an indictable offence.
 

 Yet all such laws are undeniably constitutional, and are maintained as police regulations on the ground that the public health, morals,. and property demand protection. The right to give this protection has never been successfully questioned ; .and it is evident that legal provisions in such behalf must be such as, to meet the emergency. If excessive indulgence in the use of intoxicating drinks be an evil, and no one will question it, it is the right of.the legislature to guard
 
 *533
 
 against it by wise and prudent regulations;, and such regulations obviously fall within the principle which sustains the laws referred to. If the evil be such as to demand stringent provisions, reaching to exclusion, there *is no constitutional objection to such legislation.
 

 But it is further urged, and some reliance seems to. be placed upon it, that the county commissioners of-Essex do in fact suppress sales by refusing to grant any licenses.
 

 If such were the fact, the presumption would be, that they have done it because their duty required it, unless the contrary is proved. In New York
 
 v.
 
 Miln, the court pronounce pauperism to be a moral pestilence; but pauperism is but one of the many plagues which follow intemperance.
 

 In this case, however, there is no proof of such an exercise of power by the commissioners. It does not appear that the plaintiff in error, or any one else, ever applied for and was refused a license, and an alleged abuse of power cannot be presumed in the absence of all proof. Before the plaintiff can lay any foundation for just cause of complaint, he must prove that he applied, being a suitable person for such an employment, and was refused, when the public good demanded that a license should be granted.
 

 He makes no such case on the record, but places the law itself on trial, instead of the administration of it, and relies upon the proof which it contains on its face of its unconstitutionality.
 

 The commissioners are not and cannot be placed on irial by this record, and whenever their conduct shall be arraigned in a proper manner, Í have no doubt they will justify their decisions, whatever they may be.
 

 What'is the policy of the United States on this subject ? Are we to infer, without, proof, that the United States are not equally interested with the State in promoting good morals, in protecting health, in preventing the waste of property and the increase of crime ? How can the United States have less at stake than the State, or be less interested in cherishing the virtues which make a good population, or in discouraging the vices which lead to the opposite result ?
 

 On what ground can the promotion of sobriety and temperance be hostile to the policy of the Uni ted-States ? Is it their purpose to debauch public morals, to encourage a lavish waste of property, and to multiply crimes, from the mercenary consideration of deriving revenue from a process of degradation ?
 

 Does the policy of the United States war. with the best interests of society, and are they anxious for, revenue at such sacrifices ? What proof is there of such an unnatural state of things- ?
 

 It is supposed, that the United States countenance an indiscriminate- traffic, because they permit wines and spirits to be imported,
 
 *534
 
 and lay upon them a duty. This naked fact is alleged to be evidence of a declared purpose to raise the utmost revenue which can be realized, and that a law interfering with this design is unconstitutional ?
 

 If this be so, then the law of Massachusetts which punishes habitual drunkenness is unconstitutional, for it diminishes consumption ; and the law .which 'authorizes the appointment of guardians over such persons must share the same fate, as well as all other laws which in any way regulate trade so as to impose any restraint upon it.
 

 But there is more decisive and satisfactory evidence of the policy of the United States than such remote, uncertain inferences.
 

 In 1838, Congress invited the army to abandon the use of the spirit ration, and offered by law a substitute to all who would- accept it, in sugar and coffee; and the same principle has been carried into the navy, and has met with approbation in both branches of the service.
 

 In 1813, Congress passed a law, 3 Stat. at Large, 73, in which there is a clear and decisive expression of opinion. This law imposed internal taxes, arid the collectors are authorized to grant licenses to sell at retail wines, distilled spirits, or merchandise, “provided always that no license shall be ganted to any person to sell wines, distilled spirituous liquors, or merchandise as aforesaid, who is prohibited to sell the same by any State.”
 

 Here is a clear expression of the views of Congress in regard to State legislation and State policy. It shows the deference and respect which it considered to be due to so important and delicate a subject, by conforming its legislation to that of the States, and adopting this policy. The law is now repealed, because the tax is abolished, but the opinion loses none of its weight or importance from that consideration.
 

 Again; it has been suggested that the revenue laws, which permit wines to -be imported in bottles, and brandy in'kegs of fifteen gallons, are evidence that Congress intended to confer a right to sell in such quantities, and therefore the law of Massachusetts is repugnant to them.
 

 .This argument rests .on the supposition that Congress has the right to regulate the internal trade of a State, while it is admitted that States alone possess this right. If, therefore, such were the intention of Congress, the acts would be void for unconstitutionality ; for the federal government cannot claim a power denied to it.
 

 But there is no reason for believing that those provisions were made with reference to any such- object. They relate wholly to the custom-house and to exportation. , Such is known to be the history of the fifteen-gallon kegs, and the same is doubtless true of .wines.
 

 It is a' regulation of convenience, and designed to keep the im
 
 *535
 
 port trade in a form to prevent smuggling and frauds, either in importation or exportation.
 

 These considerations go io maintain the conclusion, that the law of Massachusetts was made in good faith, and for the purposes indicated by it; that it is derived from powers distinctly reserved to the State, and'is a regulation both of the internal commerce and police ; that its provisions are adapted to the purposes for which they are designed ; that it is not a regulation of foreign commerce, or of the revenue system, and does not affect either unlawfully ; and that it is not hostile to the policy or interests of the United States.
 

 It is evident, also, that it is sustained as a police measure by the whole current of authority antecedent to, as well as by, the case of New York
 
 v.
 
 Miln.
 

 For the purposes of this case I might concede the position, for the plaintiff is not indicted for selling wiñes in the original bottle, or brandy in the original keg ; but for dealing out spirituous liquors by retail in small quantities, from a quart or pint to a gallon.
 

 The record does not show that he is an importer and vender in the original package or vessel, or that he ever had wine in bottles or brandy in kegs of fifteen gallons. If, therefore, the original importer has such a privilege, this plaintiff can make no pretension of right to it.
 

 But from what authority is this right to sell in the original vessel derived ? '
 

 But if these laws were intended, as is'supposed, to regulate the internal trade of the States, they could not be sustained ; as Congress has no power or right to regulate that traffic. They have, however, never been understood to have any such bearing , but to be what they purport, regulations of imports and exports.
 

 But-the case of Brown
 
 v.
 
 Maryland, 12 Wheat. 419, is supposed to give some support to this position.
 

 Thirdly, that such a duty, so levied, is a regulation of foreign commerce, and for that reason also unlawful.
 

 The decision goes no further than to deny the power of a State to impose a tax upon the importer, as such, before he has made a sale ; because this is, in effect, a duty on imports.
 

 There is nothing in the case which questions the right of a State to exercise police power over imports and importers, for any of the great purposes to which such legislation is directed.
 

 The principles which govern the decision are laid down with a clearness which cannot be mistaken.
 

 The court, to prevent all misapprehensions, declare that a sale of ' such goods, a breaking up of the packages, or an appropriation of the articles to use, or any' similar act, mixes the goods with the mass of property in the State, and extinguishes the privilege.
 

 The exemption is, therefore, limited to the importer and vender by the original package, and is denied to all others.
 

 The authority, consequently, furnishes no support or countenance to the case under consideration, as the plaintiff was neither an importer or vender by the original package.
 

 But if the plaintiff were an importer, instead of a retailer, the case of Brown
 
 v.
 
 Maryland would furnish no justification for a violation of the law of Massachusetts.
 

 The law is not a revenue act, but a police measure. It imposes no tax upon imports, and therefore does not fall within the pro- . hibitory clause of the constitution.
 

 The difference between the laws is this : -the State of Maryland exercised a power prohibited ; while the State of Massachusetts founds its legislation upon one which is conceded.
 

 The health laws, quarantine laws, ballast laws, .&c.,'prove that the police power may be extended to imports and importers, if .the public safety or welfare demands it. If I am right, iherefore, in assuming that the traffic in winds and spirits is a suitable object for regulation, the power' of the State cannot be successfully questioned by importers and. venders in the original package or vessel.
 

 
 *537
 
 If, then, the plaintiff had proved all the facts which have been assumed, they would avail him nothing.
 

 All the important questions which have been raised in the'case have now been considered, imperfectly, no doubt; but, having been brought to the notice of the court, they will receive the consideration which their importance deserves.
 

 The course of reasoning pursued is intended to establish the following positions : —
 

 1. That the traffic in wines and spirituous liquors has, in the public judgment, as expressed through ages and centuries, demanded restraint and regulation.
 

 That, the United States having no powers to impose such restraint, if it be denied to the States, the right is abolished.
 

 That such a result would be alike injurious to both parties, and desired by neither.
 

 That, under such circumstances, the court would be justified in declaring the law void only by commanding necessity, and that no such emergency exists.
 

 2. That, in the partition of powers between the federal and State governments, the rights of the former are granted and enumerated in the constitution, while the latter retain all powers not granted or prohibited by that instrument.
 

 That the grant of a right to regulate foreign commerce excludes the right to regulate domestic commerce, which is left in the States.
 

 That the right to make police regulations is also left in the States.
 

 That the law of Massachusetts belongs to these classes, and is derived from lawful, constitutional power vested in the State.
 

 3. That, if the right of a "State to maintain police laws is complete and unqualified, there can be no constitutional conflict with the laws of the United States, as the power is absolute and supreme.
 

 But whether this be so or not, the right of the State .to regulate- its internal traffic and police is acknowledged, and can never be questioned, except in cases of manifest incompatibility or direct re-pugnancy, and there is no proof that the law of Massachusetts has any such action, effect, or influence on the powers or laws of the United States.
 

 4. That the United States having a right to regulate foreign commerce is bounded, by the point where such commerce becomes internal, and cannot follow it for the purposes of regulation or control after it becomes subject to State authority, without usurping the constitutional power of the State.
 

 5. That the plaintiff in error was indicted, and convicted for retailing spirits without a license, being neither an importer nor vender of such spirits in the same vessels and quantities as imported.
 

 That if he had been such an importer and vender, it would avail him nothing, as the question before the court does' not relate to taxation, or fall within the prohibitory -clause of the constitution, but
 
 *538
 
 regards the right of the State to regulate its internal commerce and police after the work of the United States is completed, so far as foreign commerce is concerned, and their power exhausted.
 

 6. That, in whatever aspect this case.is viewed and considered, the law of Massachusetts cannot be drawn into doubt by the severest scrutiny -, nor can the power of the United States be made to reach or control it without a manifest, invasion of the rights reserved to the State by the terms of the constitution.
 

 Mr. 'Webster,
 

 in reply, said that he agreed with the learned counsel who had just, concluded his argument in many of the positions which he laid down. It was true that the retail trade should be regulated, and that intemperance was a-great evil.- Even if-he differed from the State on the policy of these laws, he claimed neither for himself nor the court a power to review her decision upon that point. The State was the sole and uncontrolled judge of her policy. But the- question here was one of authority, and not policy. Has • Massachusetts the power to pass such laws ? Whether she has or not, it is useless, to inquire into her motives for passing them.' It is admitted by all, that the United States have power to regulate commerce; and it is also admitted by all, that the States have certain police- powers. So far, there is no difference of opinion. But*the learned counsel says that these powers stand Upon, equal ground, both resting on sovereignty ; and his inference is, that, in case of conflict, one has as much right to stand as the other. Here our difference of opinion commences. We-say that these powers do not stand upon equal elevation, but, if there be a conflict between them, the State law must yield ■; because the constitution says that, acts of Congress, passed within the scope of the constitutional power of Congress, are the supreme law .of the land. There can be no. conflict. The State ,law must recede. It has been so settled by this court. In 3 Wheat. 209, 210, it is so laid down,'in the very terms which I use. Let us see, therefore, whether 'both laws, that is- to say, the State law and the acts of Congress, can stand. .What are they ?
 

 The former laws of Massachusetts made- it obligatory .to grant
 
 *539
 
 licenses; The phrase was
 
 “
 
 authorized and directed ” to grant, &c. But under the act of 1837 they may be withheld altogether, and the fact is, that for some years past none have been granted. Now there is no difference, in substance, between an absolute prohibition of licenses by. law, and a grant of power to another body to withhold them. In both cases; the same result is produced by the action of the same authority, namely, the State. What is this result ? It is, that no person can sell liquor in a less quantity than twenty-eight gallons.
 

 What are the laws of Congréss ? They are, that brandy can be imported in casks of fifteen gallons. 4 Statutes at Large, 235 ; ijjid. 373.
 

 What is the right of the importer after complying with these laws ? Does the right to sell follow the right to import ? This court has •already answered the question. In 12 Wheat. 433, it is said,— “ There is no difference between the power to prohibit sales and the power to.prohibit importation. None would be imported if it could not be sold.” Theré is nó exemption, by the law of Massachusetts, in favor of the importer himself. He cannot sell without a license. All are included within the law. It was .said by the counsel on the other side, that the United States have not complained of any infringement upon their authority. But this makes no difference. Cases are always brought here by individuals who complain of a violation of. their rights. It was also said, that Congress was bound to -preserve and enforce the observance of moral duties.- But if Congress does not prohibit'a particular- act, the’inference is, that it does not think proper so to do. It remains to be shown that penalties are the best mode of enforcing temperance. Father Matthew does not think so. ...The States may pursue this policy if they choose, provided they do .not interfere, with vested rights. There are two things which Massachusetts has not done, both of which it may be wished that she had.: —
 

 . 1. She has not presented a memorial to Congress to prohibit the importation of liquor in small quantities.
 

 • 2. She has not prohibited the domestic distillation of spirits. In 1840, five millions of gallons were distilled within her limits. Of this we do. not complain. But if she has a right to.pass the law now under consideration, she has also a right to exempt domestic distilled spirits from its operation. What, then, will be the condition of things ? It will be, that her restrictions will be placed exclusively upon that article which Congress have said shall be subject to no restriction.