140        CASES IN THE SUPREME COURT.

Foster v. Board of County Commissioners of Blue Earth County.

HENRY FOSTER, Plaintiff in Error, *vs.* THE BOARD OF COUNTY
COMMISSIONERS OF BLUE EARTH COUNTY, Defendants in
Error.

* ERROR TO THE DISTRICT COURT OF BLUE EARTH COUNTY.

The power granted by the States to the Congress of the United States, by the third clause of the
eighth section of the first article of the Constitution of the United States, to regulate commerce
with the Indian tribes, confers upon that body sole and exclusive control of all intercourse with
such tribes within their own country. And in consequence of such exclusive jurisdiction being
in the federal government, the Territory of Minnesota had no power in 1856 to tax the property
of licensed traders with the Winnebago Indians within the Winnebago Reservation:

Where a county directed the collection of such taxes, and received into its treasury the proceeds
thereof, an action will lie against it for the recovery of the sum so received.

The complaint of the Plaintiff below, Henry Foster, alleges
that during the year 1856, and the month of January, 1857,.
he was engaged in trading with the Indians, under a license
from the United States ; that he had a trading establishment
stocked with goods, at the Winnebago Agency, situate upon
and in the Winnebago Reservation, as reserved and set apart
by treaty between the United States and the Winnebago In-
dians, dated March 1st, 1855. That while he was so trading;
the county of Blue Earth assessed upon the stock in trade,
being upon said Reservation and belonging to said Plaintiff,
certain sums for the personal tax of 1856, and that the sheriff
of the said county, being about to levy upon said property
for the payment of said personal tax, the said Plaintiff had
paid over to said sheriff the amount so assessed, and that said
sheriff had paid the amount so collected to the county treas-
urer of Blue Earth county ; and demands judgment for the
amount so collected, etc.

The Defendant answered, admitting the main facts charged
in the complaint, and setting forth the acts of the county offi-
cers in assessing and collecting the tax on the property.

A jury trial being waived, the cause was tried by the Court,
who found, as a conclusion of law upon the facts proved and

admitted, that the complaint did not state facts sufficient to constitute a cause of action, and sustained a motion for judgment in favor of the Defendants.

The Plaintiff reviews the judgment by writ of error.

## Points and Authorities of Plaintiff in Error.

The Constitution invests Congress with the right to regulate commerce with the Indian tribes. This power is decided in *5th and 6th Peters*, hereafter cited, to include commerce, not merely in its larger sense, but to invest Congress with author-,ity to regulate "trade and intercourse with the Indians." The trade and intercourse laws dating back to the laws of June 30, 1834, (*See Brightly's Dig. U. S. Laws*), define the exercise of this jurisdiction and its limits. It is exclusive and general, and especial respecting the class of men to which the Plaintiff belonged. The lands embracing the Winnebago Reservation, were Sioux lands, over which these laws were in force until the treaty of Mendota, dated August 5, 1851. By the terms of that treaty, which is the supreme law of the land, the trade and intercourse laws are kept in force over the lands ceded to the United States, in Iowa and Minnesota, and the lands are expressly exempt from taxation.

The Winnebago Reservation was ceded to the Indians, by the treaty of February 27th, 1855, and the trade and intercourse laws were, by the terms of the treaty, kept in force. The law organizing Blue Earth county did not operate till thirty days after February 25, 1855.

The organic act of Minnesota, of 1849, was passed when these were Indian lands. There is no cession of jurisdiction, and there could not have been. The Congress reserves in the organic act, the right to make one or more Territories out of the physical boundaries embraced in the organic act, or to attach the same, or any portion thereof, to other States or Territories, (*vide sec. 1 Organic Act*), and also reserves the right to dispose of the soil.

I.—These moneys were paid under duress, and may be recovered back. 1 *Parsons on Contracts*, p. 322 *and note*; 2 *U. S. Dig.* p. 292, sec. 544.

II.—The money was collected by authority of the county, acting through the commissioners, was paid into the county treasury and received by the county, which thereby became liable for money received to its use. *Rev. Stat. p.* 409, *sec.* 15; 8 *Am. Ed. Chitty's Pl., marg. p.* 354; 18 *Pick.,* 566 ; 2 *Kernan, p.* 52; 15 *Wend.,* 321.

III.—The person and property taxed were within a *quasi* foreign jurisdiction, upon Indian lands, and subjected to the jurisdiction of the United States, so far as it obtained under the treaties, and otherwise to the jurisdiction of the " domestic dependant " nation, to which appertained the limited sovereignty reserved by the treaty. *Vide Cherokee Nation vs. State of Georgia,* 5 *Peters U. S. R.; Worcester vs. State of Georgia,* 6 *Peters,* 556; 2 *Texas Rep.,* 342 ; 20 *John.'s Rep.,* 709 &c; 2 *Barb., S. C. R.,* 639; *Commonwealth vs. Carly,* 8 *Mass., p.* 72.


Points and Authorities for Defendant in Error.


In 1848 the State of Wisconsin was admitted into the Union.

In 1849 the Territory of Minnesota was organized out of remnant of Wisconsin Territory.

In 1853 Sioux treaty.

In same year Blue Earth county organized.

In 1854 an act of Congress passed authorizing settlement on unsurveyed lands. Immediately afterwards pre-emption claimants settled on the lands now held by the Winnebago Indians.

In 1854 the government of the United States nearly completed the survey of these lands as Congress lands.

In 1855 Winnebago treaty.

I.—It was not competent for the government of the United States to infringe upon the Territorial or county jurisdiction, as attempted in this treaty.

II.—If the Court should be of opinion that this infringement must be submitted to, the Court will see to it that this infringement shall not be extended by construction beyond what may be necessary to give effect to the treaty, and pro-

tect the rights of the Indians under it, and if it be thus limited, we claim that the authority of the Legislature to impose taxes upon the property of citizens, though they may be licensed traders with the Indians and have their goods on Indian lands, is unimpaired.

III.—The history of the Territories of Wisconsin and Minnesota, and their legislation under control of Congress, as well as the usages of citizens, show that this subject has so been understood in the Territories and at Washington.

IV.—The authorities quoted by Plaintiff's counsel, from *Peters'*. *U. S. Rep. and Johnson's N. Y. Rep.*, do not at all decide the point in this case; and the remarks of the judges deciding them, are to be limited, as authority, to the questions decided in those cases, and to legitimate deductions therefrom.

V.—The Territorial Legislature either had some jurisdiction over the white citizens residing upon these Indian lands, and over their property there, or it had not. If it had, this tax was properly levied and collected. If it had not, then the county of Blue Earth is not liable to the Plaintiff in this action.

VI.—The Defendants, as representing the people of Blue Earth county, are certainly not liable for the tortious acts of the assessors or tax collectors, (1 *Kernan's R.* 394 *and* 563,) and it is at least doubtful whether, in such case, the county would be liable, even when the money has been paid into the county treasury.

J. B. Brisbin, Counsel for Plaintiff in Error.

O. O. Pelcher, and S. Finch, Counsel for Defendant in Error.

*By the Court*—Flandrau, J.—In deciding this question it will be unnecessary to give more than a brief historical sketch of the relations which the Indians within the limits of the United States and Territories, have sustained to the government. Previous to the American Revolution, Great Britain considered the Indians as nations capable of maintaining

the relations of peace and war; of governing themselves under her protection; and she made treaties with them, the obligation of which she acknowledged. When the revolution broke out it was a matter of great solicitude to the American Congress which side the Indians would adhere to in the struggle, and very great pains was taken to cultivate friendly relations with them. Various treaties of peace and friendship were entered into and terms of equality between the contracting parties were used. Some of the tribes became our friends, and some allied themselves to the British. When the war was over and the foreign enemy expelled from the country, the government naturally felt itself in a better attitude to assert that superiority which justly belongs to a civilized nation, and the subsequent treaties assumed a little more the tone of authority and protection. Yet, through all the treaties down to the present day, a certain degree of equality has been recognized, and their territorial and political rights respected.

At the adoption of the articles of confederation between the States, the great apprehension that existed of the central power absorbing the individual rights of the States, made them very reluctant to relinquish jurisdiction over any subject within their limits and previous control. They surrendered the powers of peace and war to Congress with the qualifications of a State being actually invaded, or having received "certain advice of a resolution having been formed by some nation of Indians to invade such State, and the danger being so imminent as not to admit of delay till the United States in Congress assembled could be consulted." In regard to the Indians, the instrument gave to Congress the sole and exclusive right of "regulating the trade and managing all the affairs with the Indians, not members of any of the States; *Provided*, that the legislative power of any State within its own limits, be not infringed or violated."

This exceedingly ambiguous proviso, at the end of the grant of power over the Indians, soon provoked difficulties between the States and the general government. North Carolina and Georgia so construed it, as to annul the power itself. The question was referred by Congress to a committee in 1787,

which reported an accommodation by way of avoiding any construction of the language of the grant.

This doubtful condition of the existing relations of the States and the United States to each other, concerning the Indians, was one of the many reasons that led to the abandonment of the old articles of confederation and the adoption of the constitution of the United States under which the federal government has since been administered. By the latter instrument, the States ceded to the United States exclusive power over certain subjects, national in their character, which are specified in section eight of article one. The third subject enumerated is as follows:

" To regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

It is not necessary to expend argument at the present day, to prove that this power for the regulation of commerce granted by the States, is vested solely and exclusively in Congress. The question has been most thoroughly examined by the Supreme Court of the United States in reference to that portion of the grant which refers to the Indian tribes, and it has been held by that Court, that the term "commerce" comprehends intercourse of every character with the tribes.

In the case of *Worcester vs. The State of Georgia, 6 Peters,* 515, it was held that a law of the State of Georgia which subjected to punishment all white persons residing within the limits of the Cherokee nation, and authorized their arrest within those limits, and their forcible removal therefrom and their trial in the court of a State, was repugnant to the Constitution, treaties and laws of the United States, and so void.

Under such law of the State of Georgia, a missionary within the Cherokee nation was arrested, tried and convicted. His plea to the indictment was, in substance, that the acts done were done under the authority and guarantee of the United States, and the laws of Georgia had no jurisdiction whatever over the country of the Cherokees. This plea was sustained by the Supreme Court of the United States on the ground of the exclusive jurisdiction in the federal government over the whole subject of intercourse with the Indian tribes. The historical examination of the subject by Chief

Justice Marshall, which begins with the discovery of the continent and proceeds throughout all the subsequent changes that our Indian relations have undergone, and his reasoning thereon, is most satisfactory and conclusive. We understand from this case, then, that Congress has the sole and exclusive jurisdiction over the subject of intercourse with the Indian tribes. This power of course carries with it the right to say who may trade, and under what conditions such trade shall be carried on with the tribes, and leads us to consider whether the imposition of a tax upon the goods of traders within the Indian country by the State authorities, would be incompatible with the exclusive jurisdiction over the regulation of this commerce which we have shown to exist in the Congress of the United States.

In 1824, the Cherokee nation had attained a degree of civilization which gave them a well organized government, with legislative powers. They claimed to be a sovereignty within their own dominions, and authorized to exercise the power of taxation upon all persons and subjects within their territorial limits. The nation was, however, under treaties with the United States at this time, by which they had stipulated that " the United States in Congress assembled shall have the sole and exclusive right of regulating the trade with the Indians, and managing all their affairs in such manner as they shall think proper." Under this state of things they attempted to impose a tax upon the licensed traders within their country. The subject was referred to the law officer of the United States, Attorney General William Wirt, who in a very able opinion proves conclusively that any such right on the part of the Cherokee nation, is utterly inconsistent with an exclusive right to regulate the trade in another jurisdiction. He says, with great force, that if they may tax $50, they have the same right to impose a tax of $500, $5,000 or $50,000. If they may tax for revenue they may tax for exclusion. It is the power to tax at all that is at war with the sole control of regulation elsewhere, for who but the power that imposes the tax can restrict the sum of the imposition.

Now if the Cherokee nation could not tax the traders within their limits, because they had stipulated that Congress should

have sole and exclusive power to regulate trade with their tribe, on what principle could the Territory of Minnesota, whose legislative powers were limited by precisely the same stipulation in the constitution of the United States in regard to all the Indian tribes, tax the goods of the traders upon the Winnebago lands? We confess that we find it difficult to distinguish between the two cases. This reasoning proceeds upon the supposition that the legislature of Minnesota had expressly authorized the levying of such a tax, which however was not the case. The goods of the traders were merely assessed by the officer within whose district the Winnebago lands were included, under the mistaken idea that the property was taxable under the territorial laws.

The opinion of Attorney General Wirt above referred to, is reported in a volume of the opinions of the Attorneys General of the United States published in 1841, by Henry D. Gilpin, at page 484.

Very much the same principle was held in the case of *McCullough vs. The State of Maryland*, 4 *Wheaton*, 415. That although the State was sovereign and possessed the general power of taxation, yet they had no right to tax an institution (The Bank of the United States) which the Constitution had given to Congress the power to create; because a power to tax was a power to destroy, and was utterly inconsistent with the paramount power of Congress to create. Once admit the power to tax in a sovereign State, and you virtually concede the power to destroy, because no one but the sovereign can restrain the exercise of the power. If the Territory of Minnesota could tax these traders at all, it was the sole judge of the amount it would levy and assess. The only restriction that interfered with the taxing power of the Territory is found in the sixth section of the organic act, which provides that "no tax shall be imposed upon the property of the United States, nor shall the lands or other property of non-residents be taxed higher than the lands or other property of residents," neither of which restrictions would interfere with taxing traders upon the Indian lands. It is manifest that this power in the Territory is incompatible with the power we have shown to reside in the federal government.

There is another view of the question presented by the counsel for the Defendant in error, which is not as easily solved as the one we have been considering. It is contended that the treaty making power had no right to place this tribe of Indians within the limits of an organized county of the Territory. The history of the transaction is briefly this.

The Territory of Minnesota was organized from the remnant of Wisconsin, which was left after that State was admitted into the Federal Union. This organization took place in 1849. The Winnebagoes were then within the limits of the Territory, on the Upper Mississippi river. The lands which afterwards composed Blue Earth county, were purchased by treaty from the Sioux Indians, which treaty was ratified in February, 1853. These lands, on the ratification of the treaty, became the property of the United States, and, as we have held, (2 *Minn. R.*, 155, 5 *Minn. R.*, 223) that government has but a proprietory interest in the lands it owns within a State, the jurisdiction over them being in the local sovereign, to the same extent as it exists in relation to other property within its limits, except in such cases as it is deprived of it by the terms of the original compact. In the case of the Territory of Minnesota, she had agreed not to interfere with the primary disposal of the soil, nor to tax the property of the United States. In March, 1853, (*Comp. Stat.* 79, *sec.* 34, *p.* 80, *sec.* 40), the county of Blue Earth was erected out of the Sioux lands so purchased by the United States. In 1854, Congress passed an act authorizing settlement to be made on the unsurveyed land in Minnesota; but it does not appear in this case, whether the lands included in this reservation were surveyed or settled before the Winnebago Indians were assigned to them or not, or that any question was ever raised by individuals, the county, or the Territory, against the location of the Indians on these lands. In 1855, a treaty was made between the United States and the Winnebagoes, by which certain lands in Blue Earth county were assigned to them, to be held as other Indian lands are held, and it was upon these lands that the Plaintiff's goods were when the tax was assessed against them by the county, in 1856.

Whether the United States can colonize within the limits

of an organized Territory or State, a body of savages, or any other people not citizens of the United States, without the consent, or against the will of the local sovereignty, is a very grave question; and was the point necessarily involved in this case, we would not hesitate to say no, because we think each State and Territory has the most undoubted power to exclude from its borders any class of population that it may deem detrimental to its well being, save and except citizens of the United States, who, by section two of article four of the Constitution of the United States, are entitled to all the privileges and immunities of the citizens in the several States.

These Indians were within the limits of the Territory at the time of its organization. When a change was made in their location, from the Mississippi to the Minnesota river, no objection whatever was made by the authorities of the Territory, or of Blue Earth county, to such disposition being made of them. And the country, right or wrong, became *de facto* Indian country. As long as this condition of things was quietly acquiesced in by the Territory, we doubt the power of a county to interfere by treating the location as void. The whole question of Territorial sovereignty is very much involved in doubt, and is, perhaps, more political or diplomatical than judicial in its nature, and in this case, we think it a sufficient answer to the point of the counsel for the Defendant in Error, that, if the rights of the Territory or the county were infringed upon by the location of these Indians upon their present reservation, they have not taken the proper means for redress.

The county, having directed the levy, and received the proceeds of the trespass, the action lies against it.

The judgment is reversed, and judgment ordered for the Plaintiff, according to the findings of the Court.