## SWIFT *v.* SUTPHIN.

*(Circuit Court, N. D. Illinois. September 13, 1889.)*

CONSTITUTIONAL LAW—REGULATION OF COMMERCE—MEAT INSPECTION LAW.

Act Minn. April 16, 1889, prohibiting the sale within the state of dressed meat, unless the animal within 24 hours before slaughter was inspected by state officers and found healthy and suitable for food, having the effect of excluding dressed meat from animals slaughtered outside the state, is unconstitutional as usurping the power of congress to regulate interstate commerce, and abridging the privileges and immunities of citizens of other states.

At Law. On demurrer to pleas.
*A. H. Veeder* and *M. B. Loomis*, for plaintiff.
*C. H. Wood*, for defendant.

BLODGETT, J. This is an action of *assumpsit* upon a contract entered into between the parties on the 10th day of May last, whereby it was provided that the parties should go into partnership in the city of Duluth, Minn., for the purpose of selling there, on commission, fresh dressed meats, slaughtered and prepared for market by Swift & Co. at the Union Stock-Yards in Chicago, Ill. The contract further provided that the proposed partnership should continue for five years from June 1, 1889; that the capital of the firm should be $15,000, one-half to be contributed by each party; and further provided that if either party should fail or refuse to enter into such partnership, or perform its conditions as stipulated, the party so failing or refusing should forfeit and pay to the other party the sum of $7,500. The declaration charges that the plaintiff has always been ready and willing to perform his part of the contract, but that the defendant refuses to enter upon said partnership, or in any manner comply with said agreement; wherefore the plaintiff claims damages as stipulated in the contract. The defendant, by way of defense, interposes two pleas, both of which set up, in somewhat different phraseology, an act of the general assembly of the state of Minnesota, approved April 16, 1889, prohibiting the sale of such meats as the partnership was formed to sell, unless the animals from which such meats should be taken had been inspected within 24 hours before slaughtering, and found healthy and in suitable condition to be slaughtered for human food, by inspectors appointed under the provisions of said statute. Plaintiff de-

murs to both these pleas, upon the ground that the statute invoked as a defense is in contravention of the constitution of the United States, and therefore void.

The statute in question purports by its title to be "An act for the protection of the public health, by providing for inspection before slaughter of cattle, sheep, and swine designed for slaughter for human food." The first section prohibits the sale, in the state of Minnesota, of any fresh beef, veal, mutton, lamb, or pork for human food, except as thereinafter provided. By the second section it is made the duty of the several local boards of health of the several cities, villages, boroughs, and townships within the state to appoint one or more inspectors therein, to hold office for one year, and to have jurisdiction co-extensive with the board making the appointment; and it further provides that the standing boards shall prescribe the form of certificate to be issued by the inspectors, and fix the fees for inspection, which are not to be greater than are actually necessary to defray the cost thereof. By the third section it is made the duty of the inspectors so appointed to inspect, within 24 hours before slaughter, all cattle, sheep, and swine to be slaughtered for human food within their respective jurisdictions, and, if found healthy and in suitable condition to be slaughtered for human food, to give to the applicant a certificate in writing to that effect; but if found unfit for food by reason of infectious disease, such inspectors are required to order the immediate removal and destruction of such diseased animals. By the fourth section it is enacted that any person who shall sell, expose, or offer for sale for human food in said state any fresh beef, veal, mutton, lamb, or pork whatsoever, which has not been taken from an animal inspected and certified to be fit for slaughter by the proper local inspector, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than $100, or by imprisonment not exceeding three months. By section 5 it is provided that every certificate made by inspectors under the act shall contain a statement to the effect that the animal or animals inspected, which are to be described as to kind and sex, were, at the date of such inspection, free from all indication of disease, apparently in good health, and in fit condition to be slaughtered for human food; and the sixth section provides a penalty for any false certificate made by an inspector. The demurrer to these pleas raises the question as to whether the statute in question is or is not void under the provisions of article 1, § 8, of the constitution of the United States, which clothes congress with power to regulate commerce with foreign nations, and among the several states; and also under the provisions of section 1 of article 14 of the amendments, on the ground that it abridges the privileges and immunities of citizens of other states.

Dressed meats have been from time immemorial articles of local commerce. It may be said that every civilized community has its butchers, engaged in the slaughtering and sale of animals for human food; and the courts will take judicial notice that within the last few years, by means of new appliances for the preservation of such meats, and the facilities for rapid transportation by means of railroads, a large and it may be said a

new business has grown up in the slaughtering and transportation of these dressed meats for human food to distant points from the place of slaughter, so that this business has now become an important item of interstate commerce. The press teems with accounts and statements of the magnitude of the business. The traveler journeying over our railroads meets at almost every point cars constructed and adapted expressly for such business. The records of the patent-office show the invention and patenting of many cars and warehouses specifically designed for conducting such business, and at the late session of congress a committee was appointed by the senate to investigate during the present recess, and report at the next session upon some of the phases and methods of said business; so that there can be no doubt, from common knowledge, that to-day dressed meats for human food are articles of interstate commerce. The act in question purports by its title to be an act for the protection of the public health, by providing for the inspection before slaughter of animals designed for slaughter for human food, and its validity is asserted on the ground that it is a police regulation, coming within the sphere of the state government; but even a cursory glance at its provisions shows that its practical effect and operation is to exclude all dressed meats from animals slaughtered outside of the state of Minnesota. The animals must not only be inspected within 24 hours before they are slaughtered, but they must be inspected within the state; that is, by state officers, who would have no power to act except within the state. It will therefore be assumed that this statute, in effect, excludes and prohibits the sale in the state of Minnesota of dressed meats intended for human food, from animals slaughtered outside that state.

While the state legislatures are clothed with large discretion in the exercise of their police powers for the protection of the health, property, and persons of their citizens, there can be no doubt that this power must be exercised so as not to interfere with matters over which the federal government has exclusive jurisdiction; and no matter how speciously a state statute may be worded, if in its operation it impinges upon the sphere of the federal government it is so far void. In *Mugler* v. *Kansas*, 123 U. S. 623, 8 Sup. Ct. Rep. 273, it was said by the supreme court of the United States:

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. * * * The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty, indeed, are under a solemn duty, to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect' to the constitution. * * * Undoubtedly the state, when providing, by legislation, for the protection of the public health, the public morals, or the public safety, is subject to the paramount authority of the constitution of the United States, and may not violate rights secured or guarantied by that instru-

ment, or interfere with the execution of the powers confided to the general government."

In *Brown* v. *Maryland*, 12 Wheat. 439, Chief Justice MARSHALL, speaking for the court, said:

"There is no difference, in effect, between a power to prohibit the sale of an article and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. * * * If this power reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell."

So in the *License Cases*, 5 How. 588, it was said by Mr. Justice McLEAN:

"The federal government is supreme within the scope of its delegated powers, and the state governments are equally supreme in the exercise of those powers not delegated by them, nor inhibited to them. From this it is clear that, while these supreme functions are exercised by the federal and state governments within their respective limitations, they can never come in conflict. And when a conflict occurs, the inquiry must necessarily be, which is the paramount law? And that must depend upon the supremacy of the power by which it was enacted. The federal government is supreme in the exercise of powers delegated to it, but beyond this its acts are unconstitutional and void. So the acts of the states are void when they do that which is inhibited to them, or exercise a power which they have exclusively delegated to the federal government."

And in *Railroad Co.* v. *Husen*, 95 U. S. 465, Mr. Justice STRONG, speaking for the court, said:

"We admit that the deposit in congress of the power to regulate foreign commerce and commerce among the states was not a surrender of that which may properly be denominated 'police power.' What that power is it is difficult to define with sharp precision. It is generally said to extend to making regulations promotive of domestic order, morals, health, and safety. * * * But whatever may be the nature and reach of the police power of a state, it cannot be exercised over a subject confided exclusively to congress by the federal constitution. It cannot invade the domain of the national government. * * * Neither the unlimited powers of a state to tax, nor any of its large police powers, can be exercised to such an extent as to work a practical assumption of the powers properly conferred upon congress by the constitution. * * * While we unhesitatingly admit that a state may pass sanitary laws, and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious . or infectious diseases, or convicts, etc., from entering the state; while for the purpose of self-protection it may establish quarantine, and reasonable inspec-

tion laws,—it may not interfere with transportation into or through the state, beyond what is absolutely necessary for its self-protection. It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce."

So in *Bowman* v. *Railway Co.*, 125 U. S. 465, 8 Sup. Ct. Rep. 689, 1062, a case which involved the constitutionality of the statute of Iowa prohibiting common carriers from bringing intoxicating liquors into that state, Mr. Justice MATTHEWS, in the opinion of the court, replying to the argument that the statute then in question was a proper exercise of the police power, says:

"If, from its nature, it does not belong to commerce, or if its condition, from putrescence or other cause, is such, when it is about to enter the state, that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction; and, as an incident to this power, a state may use means to ascertain the fact, And here is the limit between the sovereign power of the state and the federal power; that is to say, that which does not belong to commerce is within the jurisdiction of the police power of the state, and that which does belong to commerce is within the jurisdiction of the United States. * * * The exclusive state power is made to rest, not on the fact of the state or condition of the article, nor that it is property usually passing by sale from hand to hand, but on the declaration found in the state laws, and asserted as the state policy, that it shall be excluded from commerce. And by this means the sovereign jurisdiction in the state is attempted to be created in a case where it did not previously exist. If this be the true construction of the constitutional provision, then the paramount power of congress to regulate commerce is subject to a very material limitation; for it takes from congress, and leaves with the states, the power to determine the commodities or articles of property which are the subjects of lawful commerce. Congress may regulate, but the states determine, what shall or shall not be regulated. Upon this theory, the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is, in effect, the controlling one. The police power would not only be a formidable rival, but, in a struggle, must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be regulated. The same process of legislation and reasoning adopted by the state and its courts could bring within the police power any article of consumption that a state might wish to exclude, whether it belonged to that which was drank, or to food and clothing; and with nearly equal claims to propriety, as malt liquors, and the produce of fruits other than grapes, stand on no higher ground than the light wines of this and other countries, excluded, in effect, by the law as it now stands. And it would be only another step to regulate real or supposed extravagance in food and clothing. * * * It cannot, without the consent of congress, expressed or implied, regulate commerce between its people and those of the other states of the Union, in order to effect its end, however desirable such a regulation might be."

It is urged in behalf of the defendant that while the power to regulate commerce is so far vested in congress that the state law cannot prohibit commercial commodities from being brought into a state, this does not prevent the state legislature from prohibiting the sale after they are brought within the jurisdiction of the state. This position seems to me to be

abundantly answered in the quotation already made from the opinion of the supreme court in *Brown* v. *Maryland*, that the power of congress to regulate the introduction of articles of commerce necessarily implies the right to authorize the sale of commercial articles so introduced; and in the opinion in the *Bowman Case*, heretofore referred to, it is said by Mr. Justice MATTHEWS:

"It is easier to think that the right of importation from abroad, and of transportation from one state to another, includes, by necessary implication, the right of the importer to sell in unbroken packages at the place where the transit terminates; for the very purpose and motive of that branch of commerce which consists in transportation is that other and consequent act of commerce which consists in the sale and exchange of the commodities transported."

And Mr. Justice FIELD, in his concurring opinion in the same case, says:

"So, in the present case, it is perhaps impossible to state any rule which would determine in all cases where the right to sell an imported article under the commercial power of the federal government ends, and the power of the state to restrict further sale has commenced. Perhaps no safer rule can be adopted than the one laid down in *Brown* v. *Maryland*, that the commercial power continues until the articles imported have become mingled with and incorporated into the general property of the state, and not afterwards. And yet it is evident that the value of the importation will be materially affected if the article imported ceases to be under the protection of the commercial power upon its sale by the importer. There will be little inducement for one to purchase from the importer, if immediately afterwards he can himself be restrained from selling the article imported; and yet the power of the state must attach when the imported article has become mingled with the general property within its limits, or its entire independence in the regulation of its internal affairs must be abandoned. The difficulty and embarrassment which may follow must be met as each case arises."

The statute now in question meets at the border of the state an article of commerce intended for human food, and arbitrarily declares it unfit for such purpose, and prohibits its sale. This seems to me a palpable invasion by the state of the domain of congress. That the state authorities may provide for the inspection of such articles, and prohibit their sale if found, in fact, unfit for use as food, must be conceded; but even the power of inspection is undoubtedly so limited by the first clause of article 14 as that the citizen of another state, owning such article, is to be treated in the same manner as a citizen of the state into which the article is imported. Upon this point the following extract from the opinion in the *Bowman Case* is pertinent:

"If the state of Iowa may prohibit the importation of intoxicating liquors from all other states, it may also include tobacco, or any other article, the use or abuse of which it may deem deleterious. It may not choose, even, to be governed by considerations growing out of the health, comfort, or peace of the community. Its policy may be directed to other ends. It may choose to establish a system directed to the promotion and benefit of its own agriculture, manufactures, or arts of any description, and prevent the introduction and sale within its limits of any or of all articles that it may select as coming into competition with those which it seeks to protect."

And the same principle is affirmed in the *License Cases*, 5 How. 504; *Ward* v. *Maryland*, 12 Wall. 418; and many other cases that might be cited.

It is further urged on the part of the defendant, in support of this legislation, that the inspection of the living animal from which the meat to be sold for human food is to be taken is necessary before slaughter in order to accurately determine whether the animal is fit to be slaughtered for such purpose. This reasoning is more specious than sound, and might be applied with the same force to any manufactured, or partly manufactured, article which is the subject of commerce, and especially such as is intended for human food. The wholesomeness of flour, cured meats, corn meal, tobacco, canned fruits, fish, etc., could perhaps be more accurately determined if the raw material from which such goods were produced could be inspected before manufacture; but the admission of the doctrine that a state can interdict the introduction and sale of an article of commerce, unless an inspection is made by the proper officer of said state of the raw material from which such goods are produced, would put all commerce in the state within the control of its legislature. As is said by Mr. Justice FIELD, in his concurring opinion in the *Bowman Case*, "what is an article of commerce is determined by the usages of the commercial world, and does not depend upon the declarations of any state." The authorities, then, seem to me to fully establish the proposition that no article of commerce can be excluded from introduction into and sale in a state by state inspection laws or prohibition laws, and the common commercial usage and course of trade, and not the legislature of the state, determines what are articles of commerce. Tested by these rules, I am of opinion that the statute in question is unconstitutional and void, and furnishes no answer to the plaintiff's case.

Since preparing the notes for this decision, I have been furnished with a newspaper clipping of the opinion by Judges ENSIGN and STEARNS, of the eleventh judicial district of the state of Minnesota, in the *Case of Christian, infra,* which arose upon a writ of *habeas corpus,* Christian having been tried for a violation of this act, and sentenced to imprisonment, in which I am pleased to see that these learned judges have, in an able and exhaustive opinion, arrived at the same conclusion as myself in regard to the validity of this statute.. The demurrer to the pleas is sustained.

---

The following is the opinion of Judges STEARNS and ENSIGN, referred to above.

### *In re* CHRISTIAN.

Application for a Writ of *Habeas Corpus.*
*Cash & Williams,* for relator.
*Edmund Sherwood,* Co. Atty., for the State.

PER CURIAM. The question to be determined in above proceedings is the validity of chapter 8, Gen. Laws Minn. 1889, entitled "An act for the protection of the public health by providing for inspection, before slaughter, of cattle, sheep, and swine designed for slaughter for human food." Section 1 provides: "The sale of any fresh beef, veal,

mutton, lamb, or pork, for human food, in this state, except as hereinafter provided, is hereby prohibited." Section 2 furnishes the method of appointing inspectors. Section 3 specifies the powers and duties of the inspectors. "Sec. 4. Any person who shall sell, expose, or offer for sale, for human food, in this state, any fresh beef, veal, mutton, lamb, or pork, whatsoever, which has not been taken from an animal inspected and certified before slaughter, by the proper local inspector appointed hereunder, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than $100, or by imprisonment not exceeding three months for each offense." If the act is unconstitutional, the conviction and sentence are void, and the petitioner is entitled to his discharge. Ex parte Siebold, 100 U. S. 371, 379, 9 Amer. & Eng. Cyclop. Law, 225, 226, note 3, and cases cited. The effect of the act is to prohibit wholly the importing for sale in this state of any fresh meat whatsoever, and the question arises whether such a prohibition is not a violation of the provisions of the federal constitution.

*First.* We believe that this act violates the provisions of section 8, art. 1, of the constitution, which gives congress the power, among other things, "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes." *Second.* It violates the provisions of section 2, art. 4, of the constitution: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." The first clause above mentioned has been called by the courts the "commercial clause" of the constitution. There are certainly principles that have been established by the courts in construing it.

1. The word "commerce," as used in the clause, whether "with foreign nations," "among the several states," or "with the Indian tribes," embraces all transportation, purchase, sale, and exchange of all such commodities as are transported, bought, and sold by the usage of the commercial world. Chief Justice MARSHALL, in Gibbons v. Ogden, 9 Wheat. 1, on page 189, says: "The subject to be regulated is commerce; and our constitution being, as was aptly said at the bar, one of enumeration and not of definition, to ascertain the extent of the power, it becomes necessary to settle the meaning of the word. The counsel for the appellee would limit it to traffic, to buying and selling, or the interchange of commodities, and do not admit that it comprehends navigation. This would restrict a general term applicable to many objects to one of its significations. Commerce undoubtedly is traffic, but it is something more; it is intercourse. It describes that commercial intercourse between nations and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." Again, in Brown v. Maryland, 12 Wheat. 419, on pages 446, 447, Chief Justice MARSHALL says: "If this power [in congress to regulate commerce] reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize the sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right not only to authorize importation, but to authorize the importer to sell." In the Passenger Cases, 7 How. 283, Justice McLEAN, on page 401, adopts a like definition.

2. The power to regulate commerce, as above defined, is vested in congress exclusively; and, if congress has failed to regulate any branch of such commerce, it indicates its will that the same shall be left free, and not that the several states may regulate it. The clause was construed by the supreme court of this state, as regards commerce with the Indian tribes. In Foster v. Blue Earth County, 7 Minn. 140, (Gil. 84,) on page 145, the court say: "It is not necessary to expend argument at the present day to prove that this power for the regulation of commerce granted by the states is vested solely and exclusively in congress. The question has been most thoroughly examined by the supreme court of the United States in reference to that portion of the grant which refers to the Indian tribes, and it has been held by that court that the term 'commerce' comprehends intercourse of every character with the tribes." In Welton v. Missouri, 91 U. S. 275, the court, on page 282, says: "The fact that congress has not seen fit to prescribe any specific rules to govern interstate commerce does not affect the question. Its inaction on this subject, when considered with reference to its legislation with respect to foreign commerce, is equivalent to a declaration that interstate commerce shall be free and untrammeled. As the main object of that commerce is the sale and exchange of commodities, the policy thus established would be defeated by discriminating legislation like that of Missouri. The views here expressed are not only supported by the case of Brown v. Maryland, already cited, but also by the case of Woodruff v. Parham, 8 Wall. 123, and the Case of the State Freight Tax, 15 Wall. 232. In the case of Woodruff v. Parham, Mr. Justice MILLER, speaking for the court, after observing with respect to the law of Alabama, then under consideration, that there was no at

tempt to discriminate injuriously against the products of other states or the rights of their citizens, and the case was not therefore an attempt to fetter commerce among the states, or to deprive the citizens of other states of any privilege or immunity, said: 'But a law having such operation would, in our opinion, be an infringement of the provisions of the constitution which relate to those subjects, [commercial regulations,] and therefore void.'" The question under consideration in the Missouri case was the validity of a Missouri statute declaring that whoever deals in the sale of goods or merchandise, the products of any other state, should 'be deemed a peddler, and provided for licensing such peddlers. The plaintiff in error was a dealer in sewing-machines manufactured in another state, and was convicted and fined for selling the same without license. As shown above, the act was held void, being an interference with matters confided solely to congress. See, also, Bowman v. Railway Co., 125 U. S. 507, 508, 8 Sup. Ct. Rep. 689, 1062, where the cases are cited by Justice FIELD in his concurring opinion.

3. Naturally flowing from the two propositions above mentioned is a third, viz.: Any act of a state legislature interfering in any manner with the free transportation, sale, or exchange between citizens of different states of or in any article of commerce, is an attempted regulation of such commerce, and therefore beyond the power of the state, and void. There are, it is true, certain regulations of commerce that a state may make, where their operation is, from their very nature, local, and where congress has made no general regulation of the subject. But these regulations are considered more as an aid to, than as a regulation of, commerce. "The subjects, indeed, upon which congress can act under this power [to regulate commerce] are of infinite variety, requiring for their successful management different plans or modes of treatment. Some of them are national in their character, and admit and require uniformity of regulation affecting alike all the states; others are local, or are mere aids to commerce, and can only be properly regulated by provisions adapted to their special circumstances and localities. Of the former class may be mentioned all that portion of commerce with foreign countries or between the states which consists in the transportation, purchase, sale, and exchange of commodities. Here there can of necessity be only one system or plan of regulations, and that congress alone can prescribe." Mobile v. Kimball, 102 U. S. 691, (697.) Then follow regulations of the second class, which a state may prescribe in the absence of congressional regulation,—such as harbor pilotage, buoys, beacons, bridges, dams, etc. See, also, Cooley v. Port-Wardens, 12 How. 299; Pound v. Turck, 95 U. S. 459; cases cited by Justice BRADLEY in his dissenting opinion in Railroad v. Illinois, 118 U. S. 585, 7 Sup. Ct. Rep. 4. It cannot be contended that this act can be maintained as a regulation of the second class of subjects above mentioned.

But counsel for state claim that this act is valid as an exercise of the police power of the state, and as such ought to be upheld. In order to get the correct disposition of this claim it is indispensable to have a clear understanding of the nature and extent of the power, as given by courts and writers. Blackstone defines it to be "the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations." 4 Bl. Comm. 162. "The police of a state, in a comprehensive sense, embraces its whole system of internal regulation, by which the state seeks not only to preserve the public order and to prevent offenses against the state, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with the like enjoyment of rights by others." Cooley, Const. Lim. 572. Judge REDFIELD, in Thorpe v. Railway Co., 27 Vt. 140, (149,) says: "This police power of the state extends to the protection of the lives, limbs, health, comfort, and quiet of all persons, and the protection of all property, within the state. According to the maxim, sic utere tuo ut alienum non lædas, which being of universal application, it must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others." "The police power of the state is co-extensive with self-protection, and is not inaptly termed the law of overruling necessity. It is that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety, and welfare of society." Lake View v. Cemetery Co., 70 Ill. 192. "With the legislature the maxim of law, salus populi suprema lex, should not be disregarded. It is the great principle on which the statutes for the security of the people is based. It is the foundation of criminal law, in all governments of civilized countries and other laws conducive to safety and consequent happiness of the people. This power has always been exercised by government, and its existence cannot be denied. How far the provisions of the legislature can extend is always submitted to its discretion, provided its acts do not go beyond the great principle of securing the public safety, and its duty to provide for the public safety within well-defined limits, and with discretion, is imperative. * * * All laws for the protection of the lives, limbs, health, and quiet of persons, and the security of all property within the state, fall within this general power of the government." State v. Noyes, 47 Me. 189, (211.) The above definitions clearly disclose the great principle upon which the power rests, viz., public safety. Any law which goes

beyond this principle, which undertakes to abolish rights, the exercise of which does not infringe the rights of others, or to limit the rights beyond what is necessary to provide for the public welfare and general security, cannot be in the police power of a government.

The question has frequently arisen whether state acts, ostensibly as police reglations, do not intrude on the exclusive right of congress to regulate commerce among the states under the constitutional provision above considered. The supreme court of the United States, in considering this question, has established certain well-defined principles to ascertain what is and what is not an interference on the part of a state with interstate commerce.

*First.* The police power of a state cannot be exercised with respect to a subject-matter beyond its control. Regulation of interstate commerce is beyond state control, being confided exclusively to congress. Henderson v. Mayor of New York, 92 U. S. 259. This case arose on the validity of an act of the state of New York requiring every carrier of passengers from a foreign country to give bonds that they would not for four years become a public charge, or, in lieu thereof, to pay $1.50 for each immigrant landed. It was sought to be sustained under the police power to protect the state from paupers. But it was held void, being an attempted invasion on the rights of congress. Justice MILLER, on page 271, says: "This power, frequently referred to in the decisions of this court, has been, in general terms, somewhat loosely called the 'police power.' It is not necessary for the course of this discussion to attempt to define it more accurately than it has been defined already. It is not necessary, because, whatever may be the nature and extent of that power, where not otherwise restricted, no definition of it, and no urgency for its use, can authorize a state to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of congress by the constitution." Again, on page 272, he says: "But, however difficult this may be, it is clear from the nature of our complex form of government, that whenever the statute of a state invades the domain of legislation which belongs exclusively to the congress of the United States, it is void, no matter under what class of powers it may fall, or how closely allied to powers conceded to belong to the states." See, also, exhaustive opinion of Justice STRONG in Railroad Co. v. Husen, 95 U. S. 465, (470, 473.) See, also, Salzenstein v. Mavis, 91 Ill. 391. It follows that if fresh meats, the sale of which are prohibited by this act, are articles of commerce, the act must be held void.

*Second.* In the exercise of police power over subject-matters within their power the states cannot establish unnecessary or unreasonable regulations, and the courts will judge whether an act is a proper exercise of police power from its purpose and effect, notwithstanding its language or its ostensible purpose. In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect. Henderson v. Mayor of New York, supra, 268. In Chy Lung v. Freeman, 92 U. S. 275, a statute of California, similar to the statute of New York in the Henderson Case, came up for consideration, and was held void. On page 280, Justice MILLER says: "We are not called upon by this statute to decide for or against the right of a state, in the absence of legislation by congress, to protect herself by necessary and proper laws against paupers and convicted criminals from abroad, nor to lay down the definite limit of such right, if it exist. Such a right can only arise from a vital necessity for its exercise, and cannot be carried beyond the scope of that necessity." In Railroad Co. v. Husen, 95 U. S. 465, an act of the state of Missouri was held void which prohibited the driving or carrying of any Texas, Indian, or Mexican cattle through the state between March 1st and November 1st of each year. On page 472, Justice STRONG, giving the opinion of the court, said: "While we unhesitatingly admit that a state may pass sanitary laws and laws for the protection of life, liberty, health, or property within its borders; while it may prevent persons and animals suffering under contagious or infectious diseases, or convicts, etc., from entering the state; while for the purpose of self-protection it may establish quarantine and reasonable inspection laws,—it may not interfere with the transportation into or through the state beyond what is absolutely necessary for its self-protection. It may not, under the cover of exerting its police powers, substantially prohibit or burden either foreign or interstate commerce." Again, on page 473, the court says: "It is not a quarantine law. It is not an inspection law. It says to all natural persons and to all transportation companies, 'You shall not bring into the state any Texas cattle or any Mexican cattle or Indian cattle between March 1st and December 1st in any year, no matter whether they are free from disease or not, no matter whether they may do any injury to the inhabitants of the state or not. * * *' Such a statute, we do not doubt, it is beyond the power of a state to enact. To hold otherwise would be to ignore one of the leading objects which the constitution of the United States was designed to secure." Again, on the same page: "The police power of a state cannot obstruct foreign commerce or interstate commerce beyond the necessity for its exercise. And, under color of it, objects not within its scope cannot be secured at the expense of the protection afforded by the federal constitution. And, as its range sometimes comes very near to the field committed by the constitution to congress, it is the duty of the courts to guard vigilantly against any needless intrusion."

The case of Bowman v. Railway Co., 125 U. S. 465, 8 Sup. Ct. Rep. 689, 1062, contains

an exhaustive discussion of this whole subject, and an able review of the authorities. An act of the state of Iowa, forbidding carriers to bring within the state intoxicating liquors, except under certain regulations prescribed in it, was held void. On page 488, Justice MATTHEWS says: "It has never been regarded as within the legitimate scope of inspection laws to forbid trade in respect to any known article of commerce, irrespect- ive of its condition and quality, merely on account of its intrinsic nature and the in- jurious consequence of its use or abuse." Again, on page 489, the court quotes with ap- proval from the opinion of Justice CATRON in the License Cases, 5 How. 504, (599,) as follows: "The assumption is that the police power was not touched by the constitu- tion, but left to the states, as the constitution found it. This is admitted; and when- ever a thing from character or condition is of a description to be regulated by that power in the state, then the regulation may be made by the state, and congress cannot interfere. But this must always depend on facts subject to legal ascertainment, so that the injured may have redress. And the fact must find its support in this: whether the prohibited article belongs to and is subject to be regulated as part of foreign commerce or of commerce among the states. If from its nature it does not belong to commerce, or if its condition from putrescence or other cause is such when it is about to enter the state that it no longer belongs to commerce, or, in other words, is not a commercial article, then the state power may exclude its introduction. And, as an incident to this power, a state may use means to ascertain the fact. And here is the limit between the sovereign power of the state and the federal power. That is to say, that which does not belong to commerce is within the jurisdiction of the police power of the state, and that which does belong to commerce is within the jurisdiction of the United States. * * * What, then, is the assumption of the state court? Undoubtedly, in effect, that the state had the power to declare what should be an article of lawful commerce in the particular state; and, having declared that ardent spirits and wines were deleterious to morals and health, they ceased to be commercial commodities there, and that then the police power attached, and consequently the powers of congress could not interfere. The exclusive state power is made to rest, not on the fact of the state or condition of the article, nor that it is property usually passing by sale from hand to hand, but on the declaration found in the state laws, and asserted as the state policy, that it shall be ex- cluded from commerce. And by this means the sovereign jurisdiction in the state is attempted to be created in a case where it did not previously exist. If this be the true construction of the constitutional provision, then the paramount power of congress to regulate commerce is subject to a very material limitation; for it takes from congress and leaves with the states the power to determine the commodities or articles of prop- erty which are the subjects of lawful commerce. Congress may regulate, but the states determine what shall or shall not be regulated. Upon this theory the power to regulate commerce, instead of being paramount over the subject, would become subordinate to the state police power; for it is obvious that the power to determine the articles which may be the subjects of commerce, and thus to circumscribe its scope and operation, is in effect the controlling one. The police power would not only be a formidable rival, but in a struggle must necessarily triumph over the commercial power, as the power to regulate is dependent upon the power to fix and determine upon the subjects to be reg- ulated. The same process of legislation and reasoning * * * could bring within the police power any article of consumption that a state might wish to exclude, whether it belonged to that which was drunk, or to food and clothing; and with nearly equal claims to propriety, as malt liquors and the produce of fruits other than grapes stand on no higher ground than the light wines of this and other countries, excluded in ef- fect by the law as it now stands. And it would be only another step to regulate real or supposed extravagance in food and clothing." Again, on page 494, he says: "If the state of Iowa may prohibit the importation of intoxicating liquors from all other states, it may also include tobacco, or any other article, the use or abuse of which it may deem deleterious. It may not choose even to be governed by considerations growing out of the health, comfort, or peace of the community. Its policy may be directed to other ends. It may choose to establish a system directed to the promotion and benefit of its own agriculture, manufactures, or arts of any description, and prevent the introduc- tion and sale within its limits of any or of all articles that it may select as coming into competition with those which it seeks to protect. The police power of the state would extend to such cases, as well as to those in which it was sought to legislate in behalf of the health, peace, and morals of the people. In view of the commercial anarchy and confusion that would result from the diverse exertions of power by the several states of the Union, it cannot be supposed that the constitution or congress have intended to limit the freedom of commercial intercourse among the people of the several states."

Respecting the second question above suggested, viz., that it violates the provisions of section 2, art. 4, of the constitution, we think this is clearly shown by the cases above cited. See, also, following cases: Ward v. Maryland, 12 Wall. 418; Tiernan v. Rinker, 102 U. S. 123; Walling v. Michigan, 116 U. S. 446, (459,) 6 Sup. Ct. Rep. 454; In re Wat- son, 15 Fed. Rep. 511, and note. Now, applying these well-established principles to the act under consideration, we can see no reasonable theory upon which it can be upheld.

*First.* There is no question that fresh, wholesome meat is an article of extensive commerce among the states at the present time. Of late years it has greatly increased,

and been facilitated by the device of refrigerator cars that are seen daily by the hundreds on all our trunk lines. Meat is transported hundreds of miles in a short space of time, and when it reaches its destination it is as fresh and wholesome as when placed in the car. It is one of the greatest and most important articles of interstate commerce, and it is not in the power of this state to prohibit commerce in it. Justice FIELD, in Bowman v. Railway, supra, on page 501, says: "What is an article of commerce is determinable by the usages of the commercial world, and does not depend upon the declaration of any state." In Telegraph Co. v. Telegraph Co., 96 U. S. 1, Chief Justice WAITE, on page 9, says: "The powers thus granted [to congress to regulate commerce] are not confined to the instrumentalities of commerce, or the postal service, known or in use when the constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances." The same may undoubtedly be said of articles of commerce. This consideration alone would seem decisive of the question. Fresh meat is an article of interstate commerce. Its regulation is exclusively in congress; therefore a state law regulating it is void.

*Second.* Under the principles laid down governing police powers it is equally void. It is not an inspection law. It will not examine fresh meat to see whether or not it is wholesome. It puts all—the good and the bad alike—under the ban of destruction. It utterly destroys interstate commerce in this article, under the guise, it is true, of protecting the public health. But public health does not demand for its protection that wholesome fresh meats, the products of other states, be destroyed. A state cannot exercise such arbitrary power, no matter under what guise.

It is not necessary to enlarge. There is no mode of reasoning by which the act can be sustained, and the prisoner is discharged.